[No. 39447-2-II.   Division Two.   April 19, 2011.]

DUC TAN ET AL., *Respondents*, v. NORMAN LE ET AL., *Appellants*.

344

*Michael B. King* and *James E. Lobsenz* (of *Carney Badley Spellman PS*); *Nigel S. Malden* (of *Nigel Malden Law*); *Rebecca M. Larson* (of *Davies Pearson PC*); and *Howard M. Goodfriend* (of *Smith Goodfriend PS*), for appellants.

*Gregory M. Rhodes* (of *Younglove & Coker PLLC*), for respondents.

¶1 ARMSTRONG, J. — In 2004, members of the Committee against the Viet Cong Flag disseminated an e-mail message and several newsletter articles throughout the Olympia Vietnamese community accusing Duc Tan and the Vietnamese Community of Thurston County (VCTC), a nonprofit corporation, of being Communists or Communist supporters. Tan and the VCTC sued the committee members for defamation. A jury found the defendants liable for defamation and awarded Tan and the VCTC $310,000 in damages.

On appeal, the defendants argue, in part, that (1) the statements in the letter are opinions and therefore not actionable and (2) even if some of the supporting factual statements are false, the plaintiffs failed to prove that the defendants published the defamatory statements with actual malice. We agree that the statements in the e-mail and newsletters are not actionable and that Tan and the VCTC failed to show that the defendants published the statements with actual malice. Accordingly, we reverse and remand for dismissal.

## FACTS

A. <u>Parties</u>

¶2 Tan was a teacher in Vietnam when the Southern Vietnamese Army drafted him for military training in 1968. After training, he returned to teaching, retaining his military ranking. The Vietnamese Communist Army captured Saigon in April of 1975, and sent Tan to a Communist reeducation camp. They released him after six months to resume his teaching position. His release was contingent upon signing a loyalty pledge to the Communist Party. Tan maintains that he signed the pledge to secure his release, not because he believed in what he was signing.

¶3 Tan worked for the Communist Party as a teacher until September 1978, when, fearing for his safety, he fled Vietnam with his family. After spending time in a Malaysian refugee camp, the family settled near Olympia where Tan became active in the Vietnamese community as the principal of a Vietnamese language school and member of the VCTC.

¶4 The VCTC was started in the 1970s and became a nonprofit corporation in 1997. Duc Hua was elected its president in 1995. Tan is its director of education and is recognized as one of the organization's leaders. The VCTC engages in political activities, stating its purpose as developing the cultural, economic, and political potential of the Vietnamese community in Thurston County. In recent

years, however, its membership has dwindled and the organization's focus tends to be less political. Although the organization is in good standing today, there have been issues concerning filings with the State of Washington: for example, Tan filed a document stating that the organization had no members with voting rights.

¶5 Norman Le, Dat Ho, Phiet Nguyen, Nhan Tran, and Nga Pham, five of the defendants,[1] were all born in Vietnam. Tran and Ho escaped Vietnam when Saigon fell in 1975. Le was imprisoned in a labor camp for nine years and seven months. Nguyen was imprisoned in a labor camp for six-and-a-half years.

¶6 Like Tan, the defendants are politically active in the Vietnamese community. Le was the VCTC's secretary for several years. The defendants are all members of the Committee against the Viet Cong Flag, which was formed in 2003 to seek removal of the Socialist Republic Vietnamese flag from the lobby of South Puget Sound Community College. Many Vietnamese refugees view Vietnam's current flag as the "Communist flag," eliciting painful memories and emotions. VII Report of Proceedings (RP) at 1252. The activities surrounding the flag issues have divided the Vietnamese community.

B. Background

¶7 Several incidents form the basis of the allegedly defamatory statements, culminating in the "apron incident." We discuss them in chronological order.

1. Name Change of the VCTC

¶8 The VCTC was formed in 1975 as the Vietnamese Mutual Assistance Association. In 1995, the organization voted to change its name. Le, one of the defendants, suggested that the new name include the word "national" or "nationalist" to signal a clear anticommunist agenda. Le's

---

[1] The remaining defendants are their respective spouses. Tuan Vu, who also signed the e-mail message, was dismissed from the lawsuit.

proposal was defeated, ostensibly because the title was too long. The organization was renamed the "Vietnamese Community Association of Thurston County," which was later shortened to VCTC.

### 2. VCTC Allegedly Receiving Money from the Viet Cong

¶9  Following the name change, Le raised concerns about a local market owner's monetary contribution to the VCTC. Le believed the market owner to be a Communist because he had previously distributed free calendars that had been printed by the Communist Party in Ho Chi Minh City. The VCTC called a meeting to ask the owner why he had the calendars printed in Ho Chi Minh City. Satisfied that the owner printed the calendars in Vietnam because it was cheaper, the VCTC accepted his monetary donation. Le testified that at the meeting, Hua, president of the VCTC, stated, "[W]hat's wrong with receiving Viet Cong's [sic] money as long as we don't listen to them." VII RP at 1398. Hua denies saying this, testifying that he said only that the VCTC accepts any donation as long as no conditions are attached.

### 3. Playing of National Anthem

¶10  In 1997, the VCTC organized an event to honor a Vietnamese poet. At the start of the event, the hired band began to play Vietnam's current national anthem. After the first few notes, the band apologized for playing the wrong anthem and proceeded with the national anthem of the Republic of South Vietnam. Witnesses gave conflicting testimony about the crowd's reaction: some claimed the crowd barely noticed while others claimed there was a negative reaction. Two local Vietnamese papers wrote about the incident. The VCTC held a press conference to apologize for the mistake.

### 4. Scheduling Events on Communist Holidays

¶11  In the fall of 1999, the VCTC newsletter suggested scheduling a cultural event on September 2. The event, Armed Forces Day, commemorates the establishment of the

Southern Vietnamese Army and is typically held on June 19. The Vietnamese community knows September 2 as the date of the "Fall Revolution," when the Communist Party declared independence against the French. Later, in the fall of 2002, the VCTC organized an annual meeting. Additionally, one of the defendants testified that events sponsored by the VCTC sometimes occurred on April 30, the anniversary of the fall of Saigon. Community members testified that these dates were inappropriate for any Vietnamese celebration or event.

5. Flag Display at Language School

¶12 Tan ran a Vietnamese language school for children of Vietnamese refugees. Lacking its own facility, the language school borrowed classrooms from a private high school. Before every class, the students gathered in the hallway to salute the flag of the Republic of South Vietnam and sing its national anthem. One of the classrooms displayed flags from around the world, including the current flag of the Socialist Republic of Vietnam. Tan testified that because the classroom was on loan, the language school's policy was not to touch or modify the display. One student's parent asked, however, that the flag be removed. One of the defendants subsequently became involved and asked Tan to replace the current flag with the nationalist flag. Facing resistance from the classroom's teacher, the private school principal decided not to display any Vietnamese flag. Although the defendants knew Tan had the students honor the nationalist flag before every class, the defendants sent a delegation to the school to meet with the teacher and the principal. Eventually, the principal agreed they could display the nationalist flag at the school.

6. Leadership of the Committee against the Viet Cong Flag

¶13 In early 2003, several concerned community members met to discuss how to stop the community college from displaying the Communist flag of Vietnam. Two of the

defendants, including Le, were elected co-chairs of the committee at the first meeting. At the second meeting, which many more people attended, Tan proposed holding new elections and that Le step down given his controversial involvement in other organizations. Tan's proposal failed and Le remained one of the co-chairs. According to one of the defendants, many of those in attendance left the meeting and withdrew their support when reelections were not held. He also claimed that Tan, without advising the committee members, met with the president of the community college to discuss the issue. Several years after the initial dispute, the college agreed to remove the flag.

7. The Apron Incident

¶14 Every year, the VCTC sponsors a food booth at the Lakefair celebration in Olympia. In 2003, a volunteer working in the booth found an apron on top of a vending machine outside of the booth. The apron was decorated with an image of Santa Claus and several gold stars. The volunteer, who had served in the Southern Vietnamese Army, believed the apron bore Communist symbols and must have been placed there by "some kind of bad people." II RP at 364-65. No one knew where the apron came from, but Tan dismissed the idea that it was Communist propaganda. The volunteer turned the apron inside-out and wore it that way for the rest of his shift. He took the apron home with him at the end of the day.

¶15 Ten days later, the volunteer told Vu, one of the initial defendants, about the apron. Vu said that he would like to keep the apron as a "souvenir." II RP at 366-67. Shortly thereafter, on August 7, 2003, the defendants signed a letter (the Public Notice) describing the incident as an intentional displaying of Communist symbols to show the presence of the Communist regime in the Vietnamese community. The letter called for a press conference and meeting to debate the allegations, but neither Tan nor any other VCTC representative attended the meeting.

C. <u>The Defamatory Statements</u>

1. The Public Notice

¶16 The defendants disseminated the Public Notice by e-mail and posted it on the Internet. The first section of the letter describes the "apron incident." The second section accuses the VCTC of "doing activities for the Vietnamese Communist[s]," enumerating the following conduct by Tan and the VCTC as "correct and true evidences":

1. When choosing a name (for the organization), the Duc Thuc Tan (Duc TT) and Khoa Van Nguyen gang insisted that the name "National Vietnamese Committee" . . . be denied. . . . Mr. Duc TT claimed . . . he "does not have members". . . . It is obvious that [the] Vietnamese Community in Thurston County had been impersonating the representatives of the community with illegal political intentions.

2. Duc Minh Hua, . . . President [of VCTC], . . . declaring . . . "there [was] nothing wrong with receiving [Viet Cong] money."

3. Suggest[ing] the idea of organizing the yearly anniversary of September 2 [the Fall Revolution].

4. The band that Duc TT brought . . . played the whole portion . . . of the [communist national anthem at the 1997 event].

5. [The] [Viet Cong] flag was hung in [Duc Tan's] classroom. . . . [u]ntil . . . organizations . . . convince[d] the Administration to remove the [Viet Cong] flag and let fly the National flag.

6. Organized the Autumn 2002 Meeting to commemorate the Fall Revolution.

7. Had sabotaged the fight of the Committee . . . from the unit in charge of the Community Against Viet Cong Flag [and] had "gone under the table" with the administration of . . . [South Puget Community College] to send the secret message [that] there is no need for removing the bloody communist flag.

8. [C]leverly [covering] up, cheating [our] people, all those 28 years [as shown by Duc Tan's admission the VCTC had no voting members].

Ex. 8. The third section concludes that Tan and the VCTC have abused people's names, hidden under the "Nationalist

coat" to serve the Communist regime in Vietnam, and betrayed the Vietnamese community "continuously and systematically." The letter states that no one—referring to Tan and the leaders of the VCTC—has a background guaranteeing they are Nationalists. Finally, the letter asks that community members condemn, boycott, and expel Tan and the VCTC, who allegedly "worship the Communists" and conduct activities on behalf of "evil communists." Ex. 8.

### 2. Newsletter Articles

¶17 Three additional newsletter articles, written by Le, contain allegedly defamatory statements. The first two articles were published on November 15, 2002, in the *Community Newsletter*, an informal publication of the "Vietnamese Community of Washington State." The first article describes the flag display issues at the language school. It states that after the delegation came to the school and convinced the principal to allow them to permanently display the Vietnamese Nationalist flag, Tan refused to help display it. The second article warns of an "evil axis" made up of organizations that assist the Viet Cong. The article identifies the VCTC as one such organization, noting that it played the Viet Cong national anthem and called for a celebration on September 2. The article claims that the leadership of the VCTC is part of a plot "to form the Evil Axis in Thurston-King-Tacoma aiming at a total control over the whole Vietnamese community in Washington State by the [Viet Cong]." Exs. 14A, 18. Finally, the article notes that "they" never use the word "Nationalist" in any of their organization's names. These articles were translated and admitted into evidence at trial.

¶18 The third article was published in October 2003, in a newsletter called *New Horizon: The Voice of the Vietnamese Community in Washington State*. This article refers to Tan's organization as an "under-cover agent[ ]" Ex. 14A. It asserts that for many years undercover agents, including Tan, have attempted to display Viet Cong flags in schools while disguised as Nationalists. Excerpts of this article were translated and admitted into evidence.

## D. Procedural History

¶19  In March 2004, Tan and the VCTC sued the signatories to the Public Notice for defamation, including Le, his wife, and five other married couples.

¶20  The trial court granted partial summary judgment for the defendants, ruling that Tan and the VCTC "are public figures as a matter of law." Clerk's Papers at 31. After an 11-day trial, the jury found by special verdict that the defendants had defamed Tan and the VCTC; the jury awarded Tan damages of $225,000 and the VCTC damages of $85,000.

### ANALYSIS

## I. Actionable Statements

¶21  The defendants argue that the statements made in the Public Notice are political opinions, protected by the First Amendment. They reason that the "gist" or "sting" of the Public Notice is that Tan is a Communist or Communist sympathizer, opinions that cannot support a defamation action. Br. of Appellant at 33.

¶22  Tan and the VCTC respond that the statements about their political affiliation go beyond opinion by accusing them of taking tangible steps to support the Communist Party. Alternatively, they maintain that even if the Public Notice's overarching assertions qualify as statements of opinion, the underlying facts used to support the claim are untrue and therefore actionable as defamation.

¶23  A defamation action consists of four elements: (1) a false statement, (2) lack of privilege, (3) fault, and (4) damages. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 768, 776 P.2d 98 (1989). Generally, a statement must be one of fact to be actionable. *Dunlap v. Wayne*, 105 Wn.2d 529, 538, 716 P.2d 842 (1986); *see also Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997) ("A defamation claim must be based on a statement that is provably

false."). In contrast, because there is no such thing as a false idea, most expressions of opinion are protected by the First Amendment and are not actionable. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 55, 59 P.3d 611 (2002); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.").

¶24 An opinion can support a defamation claim if it implies that undisclosed defamatory facts form the basis of the opinion. *Dunlap*, 105 Wn.2d at 538 (quoting RESTATEMENT (SECOND) OF TORTS § 566 (1977)); *see also Milkovich v. Lorain Journal Co*, 497 U.S. 1, 18, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (there is not a wholesale exception to defamation for anything that might be labeled an opinion). But a defamation claim fails when the audience members know the facts underlying an assertion and can judge the truthfulness of the alleged defamatory statement themselves. *Dunlap*, 105 Wn.2d at 540. We will not seek to impose a rigid distinction between fact and opinion. *Dunlap*, 105 Wn.2d at 538-39; *see also* RESTATEMENT (SECOND) OF TORTS § 566 cmt. b (an opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts that he has stated). Whether an allegedly defamatory statement is actionable is a threshold question of law for the court. *Benjamin v. Cowles Publ'g Co.*, 37 Wn. App. 916, 922, 684 P.2d 739 (1984).

¶25 In considering whether an allegedly defamatory statement is actionable, we examine all the circumstances surrounding it. *Dunlap*, 105 Wn.2d at 539. Three factors guide us in this analysis: (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implied undisclosed facts. *Dunlap*, 105 Wn.2d at 539. The third circumstance is the most crucial of the three factors. *Dunlap*, 105 Wn.2d at 539.

■ ¶26 Generally, audiences should expect statements of opinion in contexts such as political debates. *Dunlap*, 105 Wn.2d at 539. And we view such statements "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks. . . ." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Tan and the defendants are prominent community leaders engaged in a protracted debate over how best to achieve the political goals of the Vietnamese refugee community. The political activities of their respective organizations and committees, such as efforts to remove displays of the Communist flag across Washington State, are matters of public concern to the Vietnamese community. The defendants sought an exchange of ideas by inviting representatives of the VCTC to a public hearing to "present its side of the matter." Ex. 8. Undeniably, the Public Notice was written and disseminated in the context of political debate. Thus, we presume the audience was prepared for mischaracterizations, exaggerations, rhetoric, hyperbole, and biased speakers. *Dunlap*, 105 Wn.2d at 539. Accordingly, we accept that the Vietnamese community, as recipients of the Public Notice, understood the context of the statements and the authors' biases.

■ ■ ¶27 Finally, no statement or assertion in the Public Notice implies the existence of undisclosed facts. To the contrary, the letter painstakingly outlines "correct and true evidences" to support the conclusion that Tan and the VCTC support the Communist Party. Given the nature of this disclosure, there is no reason to believe that the defendants withheld facts that would have bolstered their assertions. And even though several of their assertions—that Tan is actively supporting the Communist Party—are presented like facts, we reject labeling them as actionable. *See Dunlap*, 105 Wn.2d at 540 (quoting W. Page Keeton, *Defamation and Freedom of the Press*, 54 Tex. L. Rev. 1221, 1250-51 (1976) (where an author makes an assertion of fact

based on disclosed information, he simply deduces a particular fact from known facts)); *see also Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980) (even apparent statements of facts may assume the character of opinion when made in a political debate). The disclosure of facts allowed the recipients of the Public Notice to judge for themselves the validity of the defendants' conclusions about Tan's political views. In addition, the public was invited to the hearing to examine the "evidences" and evaluate the accuracy of the accusations. All three of the *Dunlop* factors support our conclusion that the defendants' claim that Tan and the VCTC are Communists or Communist sympathizers are protected political opinions. *Snyder v. Phelps*, ___ U.S. ___, 131 S. Ct. 1207, 1219, 179 L. Ed. 2d 172 (2011) (" 'in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate "breathing space" to the freedoms protected by the First Amendment' " (alteration in original) (quoting *Boos v. Barry*, 485 U.S. 312, 322, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988))).

¶28 Nonetheless, Tan and the VCTC maintain that the underlying untrue facts are actionable. A defendant who bases his derogatory opinion of the plaintiff on his own statement of false and defamatory facts can be subject to liability for the factual statement but not for the expression of opinion. RESTATEMENT (SECOND) OF TORTS § 566 cmt. c; *Dunlap*, 105 Wn.2d at 538 (adopting the rule of RESTATEMENT § 566). But not every misstatement of fact is actionable; it must be apparent that the false statement presents a substantial danger to the plaintiff's personal or business reputation. *Mark v. Seattle Times*, 96 Wn.2d 473, 493, 635 P.2d 1081 (1981); *Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l Union, Local 1001*, 77 Wn. App. 33, 44, 888 P.2d 1196 (1995). When a report contains a mixture of true and false statements, a false statement affects the " 'sting' " of the report only when " 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report

without the falsehood." *Herron*, 112 Wn.2d at 769. The "sting" of a report is the gist or substance of a report when considered as a whole. *Herron*, 112 Wn.2d at 769. To be actionable, the allegedly false statements here must lead to a distinct and separate damaging implication not otherwise conveyed in the general message of the Public Notice. *See Herron*, 112 Wn.2d at 774.

¶29 In *Mark*, the court found that the inaccurate reporting of the amount of misappropriated money did not alter the "sting" of the story, reasoning that the amount involved did not affect the damage done to the plaintiff from being called a thief. *Mark*, 96 Wn.2d at 496. In contrast, the *Herron* court found that a similar inaccuracy regarding the amount of money that the plaintiff received in campaign contributions *did* alter the sting of the story. *Herron*, 112 Wn.2d at 774. The court reasoned that while a small percentage of the total campaign contributions constituted a reasonable donation, the statement that a group contributed over 50 percent of all campaign contributions implied that the plaintiff had taken a bribe. *Herron*, 112 Wn.2d at 774. Because the impression that the plaintiff had sold his integrity as a public official was an implication not otherwise made in the report, the statement was actionable. *Herron*, 112 Wn.2d at 774.

¶30 Here, the "sting" of the Public Notice is that Tan and the VCTC are Communists. This is clear not only from reading the Public Notice as a whole but also from the plaintiffs' characterization of their case at trial. In opening statements, plaintiffs' counsel explained that "[t]here could be nothing more odious, nothing more hateful, and nothing more hurtful than calling my client a communist." I RP at 195. Then, in closing arguments, counsel reiterated that being called a Communist is not just an insult, "[i]t is the insult." IX RP at 1612. Where the plaintiffs' theory before the jury was that being labeled a Communist is the most severe and shameful accusation in the world of Vietnamese refugee politics, any factual misstatements in the Public Notice do not cause additional distinct and separate harm.

In fact, rather than impugning some other aspect of Tan's character or the VCTC's associations, all the statements were presented as evidence supporting the claim that Tan and the VCTC are Communists.

¶31 Moreover, many of the allegedly false statements are equivocal at best. Tan and the VCTC highlight the following statements as false: (1) that Hua declared there is nothing wrong with receiving Viet Cong money, (2) that the audience "protested violently" when the band played the Viet Cong anthem, (3) that Tan "refused to display" the national flag at the language school and claimed that a delegation was sent there to intimidate him, (4) that the VCTC organized an annual meeting to commemorate the Fall Revolution, and (5) that Tan had "gone under the table" with the administration of the community college and sent a secret message that there was no need to remove the Communist flag. Br. of Resp't at 30-34. While a defamatory statement must be provably false, these statements are the defendants' characterizations or interpretations of events that took place. Their characterizations, though biased and perhaps exaggerated, fall under the type of rhetoric to be expected throughout a political debate. *Dunlap*, 105 Wn.2d at 539.

¶32 Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection. *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). That labeling Tan a Communist is inflammatory is precisely the reason the First Amendment affords it near perfect protection. *Milkovich*, 497 U.S. at 20 (First Amendment protections extend to rhetorical hyperbole, which has traditionally added much to the discourse of our nation). Considering the whole document, all of the allegations—whether true, inaccurate, or false—are merely iterations of the defendants' conclusion that Tan and the VCTC are Communists. Even if some of the statements are in fact inaccurate, Tan

and the VCTC have failed to identify any separate or distinct harm resulting from each untrue statement.[2]

¶33 Turning to the newsletter articles, the defendants urge us to collapse our analysis of the articles into our review of the Public Notice. They reason that the overarching assertion of the newsletter articles is the same as the Public Notice—that Tan and the VCTC are Communists—and that the articles differ only by asserting one factual basis at a time instead of an exhaustive list. Tan and the VCTC concede that the news articles fit within the general analysis of opinion accompanied by specific supporting facts, and that we can analyze them similarly to the Public Notice. Although we do not reject their concession—indeed, our discussion above resolves any claims arising from the articles that contain facts in support of the assertion that Tan is Communist—we note some differences between the Public Notice and the newsletters. In particular, the *Community Newsletter* article detailing the events surrounding the display of the flag at the school does not editorialize. The *New Horizon* article describes members of the VCTC as undercover Viet Cong agents disguised as nationalists but does not disclose facts in support of this statement. Thus, we discuss the sufficiency of the plaintiffs' actual malice evidence to show that even if we considered any of the factual statements to be actionable, their claims would fail.

## II. Actual Malice

¶34 The defendants argue that the plaintiffs failed to prove they acted with actual malice. Specifically, they argue that Tan and the VCTC failed to prove that, at the time of publication, the defendants had serious doubts about the

---

[2] At January 14, 2011 oral argument, the plaintiffs' counsel claimed that even if the allegedly false statements support the overarching assertion that Tan is a Communist, they are equally defamatory in their own right. But counsel is incorrect in separating each statement from the gist of the letter. *See Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 37, 723 P.2d 1195 (1986) (in determining whether a publication is defamatory, it must be read as a whole and not in part or parts detached from the main body).

truth of their statements or knew that their statements were probably false.

¶35 A public figure defamation plaintiff must prove with clear and convincing evidence that the defendant made the statements with "actual malice." *Sullivan*, 376 U.S. at 279-80. A defendant acts with malice when he knows the statement is false or recklessly disregards its probable falsity. *Sullivan*, 376 U.S. at 279-80. A defamation plaintiff proves reckless disregard by showing that the defendant published with a "high degree of awareness of . . . probable falsity" or entertained serious doubts as to the truth of the publication. *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964); *Herron*, 112 Wn.2d at 775.

¶36 In reviewing for evidence of actual malice, we focus on whether the defendant believed in the truth of the challenged statement. *See Margoles v. Hubbart*, 111 Wn.2d 195, 200, 760 P.2d 324 (1988). We do not measure reckless conduct by asking whether a reasonably prudent person would have published or would have investigated before publishing. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). Actual malice can, however, be inferred from circumstantial evidence, including a defendant's hostility or spite, knowledge that a source of information about a plaintiff is hostile, and failure to properly investigate an allegation. *Margoles*, 111 Wn.2d at 200. These factors in isolation are insufficient to establish actual malice; they must cumulatively amount to clear and convincing evidence of malice to sustain a verdict in favor of a plaintiff. *Margoles*, 111 Wn.2d at 200.

¶37 In reviewing a defamation verdict, the First Amendment requires us to independently evaluate whether the record supports a finding of actual malice. *Richmond v. Thompson*, 130 Wn.2d 368, 388, 922 P.2d 1343 (1996); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984) ("The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law.") Although we still defer to the fact finders' credibility deter-

minations, we have considerable latitude in deciding whether the evidence supports a finding of actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 689 n.35, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (appellate court should not disregard a jury's opportunity to observe live testimony and assess witness credibility). In *Bose*, the issue was whether the author of the defendant's article reviewing the plaintiff's sound system truthfully described the apparent movement of the sound from the speakers. *Bose*, 466 U.S. at 494-95. The United States Supreme Court accepted the trial court's determination that the author was not credible in explaining his choice of wording. *Bose*, 466 U.S. at 512. But unlike the trial court, the Supreme Court was unwilling to infer actual malice where "the language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." *Bose*, 466 U.S. at 512-13 (quoting *Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971)). The Court held that even if the witness knew that his wording was inaccurate, his disingenuous trial testimony was insufficient to prove that he wrote the challenged statement with actual malice. *Bose*, 466 U.S. at 512-13.

¶38 In *Harte-Hanks*, the United States Supreme Court considered whether the Sixth Circuit's independent review of the jury's finding of actual malice was consistent with *Bose*. *Harte-Hanks*, 491 U.S. at 659. In that case, the defendant newspaper published a story claiming that the plaintiff, a candidate for municipal court judge, had promised sisters Alice Thompson and Patsy Stephens jobs and vacations in return for making allegations of corruption against the incumbent judge's court administrator. *Harte-Hanks*, 491 U.S. at 660. The plaintiff allegedly made the promises in a tape-recorded meeting with six persons present in addition to the plaintiff and his wife. The newspaper interviewed the plaintiff, who denied making the promises. It also interviewed five of the other witnesses, all of whom denied that the plaintiff had made any prom-

ises. Nonetheless, the newspaper published the story with Thompson as the only source. *Harte-Hanks*, 491 U.S. at 691. But the newspaper failed to interview Stephens, the remaining and critical witness, and failed to listen to the tape recording of the meeting, which the plaintiff had made available. *Harte-Hanks*, 491 U.S. at 682-83. Like the appellate court, the Supreme Court affirmed the jury's finding that the newspaper published with actual malice, but it rejected the appellate court's reliance on facts the jury *could* have found. *Harte-Hanks*, 491 U.S. at 690. Searching for less speculative grounds to support actual malice, the Court analyzed the trial court's instructions, the jury's answers to the three special interrogatories, and the undisputed facts to ascertain that the jury *must* have rejected the defendant's explanations for its omissions. *Harte-Hanks*, 491 U.S. at 690-91. The Court held that when considered alongside the undisputed evidence—that the newspaper never listened to the tape recording and never interviewed Stephens—the jury's findings supported the conclusion that the defendant purposefully avoided learning facts that would have proved its story false. *Harte-Hanks*, 491 U.S. at 690-91.

¶39 The Washington State Supreme Court engaged in a *Bose* analysis in *Richmond*, 130 Wn.2d at 389. There, a Washington State Patrol Trooper, Davis Richmond, sued Woodrow Thompson for publically accusing the trooper of pushing him, pointing a gun at him, and telling him that he would blow his brains out. *Richmond*, 130 Wn.2d at 373-74. The court accepted the trial court's finding that Thompson acted with actual malice based on two eyewitnesses who testified that the trooper did not push Thompson or unclip his weapon, the trooper's testimony that he did not threaten to blow Thompson's brains out, and the fact that Thompson first alleged the trooper's misconduct six months after the incident. *Richmond*, 130 Wn.2d at 388-89. In reaching this conclusion, the court accepted that the jury gave great weight to the trooper's testimony but also relied on the "direct evidence" of the eyewitnesses and the timing of Thompson's allegations. *Richmond*, 130 Wn.2d at 388-89.

¶40 A finding that the defendant or his spokesperson has not been credible may be sufficient to prove malice " 'when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves.' " *Bose*, 466 U.S. at 512 (emphasis omitted) (quoting *Time, Inc.*, 401 U.S. at 285). But it is inadequate where an allegedly defamatory statement is only " 'one of a number of possible rational interpretations' " of events that " 'bristle[ ] with ambiguities.' " *Bose*, 466 U.S. at 512-13 (quoting *Time, Inc.*, 401 U.S. at 290); *see also Harte-Hanks*, 491 U.S. at 689-90. Moreover, we cannot assume that in a complex trial with multiple defendants and over 20 witnesses, the jury disbelieved or rejected all the testimony of the defense witnesses. Where we can only speculate as to the jury's assessment of each witness, and where the events underlying the alleged defamation are wrapped in obscurity and capable of being interpreted or described in more than one way, we require evidence independent of possible credibility determinations to support a jury's finding of actual malice. *See Harte-Hanks*, 491 U.S. at 690-91.

¶41 Turning to the evidence, Tan and the VCTC contend that the jury obviously rejected the defendants' assertions that they wrote the Public Notice statements in good faith. They point out that the disclosure of information about Tan's release from a reeducation camp after signing a loyalty pledge and his continued employment as a teacher by the Communist Party occurred *after* the Public Notice was written, thereby undermining the defendants' assertions of good faith regarding that publication. But discredited testimony is not sufficient to support a contrary conclusion. *Bose*, 466 U.S. at 512 (relying on *Moore v. Chesapeake & Ohio Ry.*, 340 U.S. 573, 575, 71 S. Ct. 428, 95 L. Ed. 547 (1951)). In *Bose*, the Court held that although the discredited testimony did not rebut any inference of actual malice, it alone did not prove actual malice by clear and convincing evidence. *Bose*, 466 U.S. at 512. Here, it is possible the jury rejected all of the defendants' professions of good faith and believed that the defendants were disin-

genuous in citing Tan's history with the Communist Party as a basis for their good faith claim. Even so, the discredited testimony fails to meet the clear and convincing standard where the underlying events are capable of being honestly perceived very differently by different people.

¶42 Tan and the VCTC also argue that the defendants knew their statements were false because the defendants must have been "aware" of the truth.[3] Br. of Resp't at 31-32, 34. But where the events are not sufficiently clear to "speak for themselves," arguing that the defendants unreasonably construed the facts imposes a negligence standard on the defendants that is at odds with the plaintiffs' burden of proving the defendants' actual beliefs. *See Bose*, 466 U.S. at 512. That a reasonable person would have been aware of the inaccuracies is not enough to establish a defendant's actual malice, particularly where, as here, the underlying incidents are colored in shades of gray, not black or white. *Bose*, 466 U.S. at 511-12.

¶43 Finally, Tan and the VCTC argue they proved actual malice with the following: (1) the committee members made no attempt to contact Tan before publishing the Public Notice; (2) the defendants had previously worked with Tan to organize events opposing Communism until the divisive flag committee meetings in 2003; (3) the defendants had a history of acrimony with Tan; (4) some of the defendants had witnessed Tan speak publicly on flag issues, most likely in support of displaying the nationalist flag; (5) the defendants failed to investigate any of the facts

---

[3] Specifically, Tan and the VCTC cite the following examples to prove that the defendants knew their statements were false: (1) defendants knew that people did not boycott the VCTC because Le remained associated with the VCTC after the name change; (2) Le knew that Hua never said he would accept Viet Cong money because Le was present when Hua spoke; (3) the VCTC newsletter did not advocate for organizing on the anniversary of September 2; (4) the defendants were aware that the playing of the Vietnam national anthem was an accident and that the reports of violent protests were exaggerated impressions; (5) none of the defendants testified that Tan actually refused to display the nationalist flag and Ho even testified that he was aware that Tan displayed the national flag at the language school; and (6) the defendants admitted that if the VCTC had held a meeting to commemorate the Fall Revolution, there would have been an uproar and significant media attention.

before publication, including the authenticity of the apron; and (6) the defendants were upset that Tan arranged a meeting with the president of the community college because it diverted attention from their committee.

¶44 But these factors, whether considered alone or together, fail to prove that the defendants published their accusations with actual malice. Their failure to contact Tan or investigate the authenticity of the apron suggests, again, only that the defendants were negligent. In *Harte-Hanks*, the Court distinguished the failure to investigate from the purposeful avoidance of the truth. *Harte-Hanks*, 491 U.S. at 692; *see also Sullivan*, 376 U.S. at 287-88 (failure to investigate is not sufficient to prove recklessness). Unlike the newspaper in *Harte-Hanks*, whose inaction was a deliberate decision not to acquire knowledge, the defendants called for a public hearing and asked Tan and the VCTC to participate. Although the hearing was scheduled after the letter was published, the defendants' willingness to engage in further debate about the issues rebuts any inference that they sought to purposely avoid the truth. Moreover, the defendants never admitted they had concerns about the truthfulness of their charges, as opposed to the authors in *Harte-Hanks*, who admitted to Thompson that they had concerns about whether Stephens would corroborate her story. *Harte-Hanks*, 491 U.S. at 682. In contrast, the defendants' belief that the apron was Communist propaganda is entirely plausible given their experience and political perspective, and nothing in the record suggests that they thought otherwise. There is no evidence that the defendants deliberately ignored contrary evidence or otherwise sought to avoid the truth. *See Harte-Hanks*, 491 U.S. at 692-93.

¶45 Unlike the records in *Harte-Hanks* and *Richmond*, the evidence here does not clearly and convincingly set forth direct or undisputed facts that support a finding of actual malice. In *Harte-Hanks*, the Court relied primarily on two pieces of undisputed evidence in holding that the newspaper deliberately ignored evidence that would undermine its story: the newspaper's failure to interview a key

eyewitness and its failure to listen to the plaintiff's recording of the conversation where he allegedly offered bribes to the sisters. *Harte-Hanks*, 491 U.S. at 692. And in *Richmond*, the direct evidence consisted of testimony from the trooper and two eyewitnesses that flatly contradicted Thompson's account of the incident. The circumstantial evidence that Thompson did not accuse the trooper until six months after the incident merely supported the testimony by the trooper and the two eyewitnesses. *Richmond*, 130 Wn.2d at 389. Thus, concrete, factual evidence of actual malice supported credibility determinations made in the plaintiffs' favor in both *Harte-Hanks* and *Richmond*.

¶46 Here, the history of acrimony between Tan and the defendants and the fact that Tan had previously worked with the defendants on political issues bolsters the plaintiffs' case theory but offers no concrete support for their claim of actual malice. That the defendants had worked with Tan to oppose Communism and knew he had spoken in favor of displaying the nationalist flag is equivocal and does not eliminate the possibility that they thought Tan was secretly working for the Communists. It is also impossible to pinpoint the cause of the acrimony between Tan and the defendants; it may have stemmed from the defendants' perceptions that Tan was sympathetic to the Communists. If so, this acrimony offers no support for the notion the defendants falsely accused Tan of being a Communist. A showing of ill will or malice, in the ordinary sense, is insufficient to prove "actual malice." *Harte-Hanks*, 491 U.S. at 666. Without evidence that unequivocally shows that the defendants knew or entertained serious doubts that Tan was a Communist or Communist supporter, the circumstantial evidence offered by the plaintiffs shows, at best, that a reasonable person would question the charge. This is insufficient to prove that the defendants subjectively believed their statements false or even probably false.

¶47 In sum, Tan and the VCTC contend that clear and convincing evidence shows that the defendants simply seized upon the apron incident as an opportunity to defame

them. The context of this case suggests otherwise: the Vietnamese community takes seriously what it perceives to be a very real threat of Communism. Within this context, the defendants attacked Tan and the VCTC for being Communists or Communist sympathizers. During the course of the conflict, the defendants used the tools people frequently use to advance a political position—vitriol and hyperbole. The defendants may also have been overly quick to build a conspiracy theory from facts too scant and equivocal to persuade a jury that the conspiracy existed in fact. Nonetheless, the defendants' mischaracterizations, exaggerations, and seemingly improbable inferences took place in an ongoing political discussion protected by the First Amendment. And to the extent the defendants made factual statements not encompassed by the opinion framework, the plaintiffs failed to prove actual malice.

¶48 We reverse and remand for dismissal.

PENOYAR, C.J., and QUINN-BRINTNALL, J., concur.

Review granted at 172 Wn.2d 1010 (2011).