**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 09 2013

Madsen, C. J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on May 9, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| DUC TAN, a single man; and VIETNAMESE COMMUNITY OF THURSTON COUNTY, a Washington corporation, | ) ) ) | No. 86021-1 |
|  | ) |  |
| Petitioners, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| NORMAN LE and PHU LE, husband and wife; TUAN A. VU and HUYNH T. VU, husband and wife; PHIET X. NGUYEN and VINH T. NGUYEN, husband and wife; DAT T. HO and "JANE DOE" HO, husband and wife; NGA T. PHAM and TRI V. DUONG, wife and husband; and NHAN T. TRAN and MAN M. VO, wife and husband, | ) ) ) ) ) ) ) ) ) | En Banc |
|  | ) |  |
| Respondents. | ) | Filed MAY 09 2013 |
|  | ) |  |

MADSEN, C.J.—In 2003, members of the Committee Against the Viet Cong Flag disseminated an e-mail message throughout the Olympia Vietnamese community accusing Duc Tan and the Vietnamese Community of Thurston County (VCTC), a nonprofit corporation, of engaging in procommunist activities. Additionally, defendant Norman Le authored three newsletter articles repeating allegations from the e-mail and also accusing Tan and the VCTC of being undercover Viet Cong agents. Tan and the VCTC sued the authors of the publications for defamation.

The trial judge determined that Tan and the VCTC were public figures as a matter of law at summary judgment.[1] The case then proceeded to trial where a jury found Le and his coauthors liable for defamation and awarded Tan and the VCTC $310,000 in damages. The Court of Appeals reversed and remanded for dismissal, finding the statements in the e-mail and newsletters were protected opinion supported by disclosed facts, with the exception of the allegation that members of the VCTC, including Tan, are undercover Viet Cong agents. The court found Tan and the VCTC failed to make the requisite showing that the authors published any of the statements with actual malice.

We hold that the defamatory statements made by Norman Le and the other authors were not protected opinion and therefore actionable. We also hold that clear, cogent, and convincing evidence supports the jury's finding of actual malice with respect to those statements. We reverse the Court of Appeals and reinstate the jury's verdict.

## FACT AND PROCEDURAL HISTORY

Tan was a teacher in Vietnam when the Southern Vietnamese Army drafted him for military training in 1968. After training, he returned to teaching, retaining his military ranking. The Vietnamese Communist Army captured Saigon in April 1975 and sent Tan to a communist reeducation camp. They released him after six months to resume his teaching position. His release was contingent upon signing a loyalty pledge to the Communist Party. To secure his release, Tan signed the pledge.

Tan worked for the Communist Party as a teacher until September 1978, when, fearing for his safety, he fled Vietnam with his family. After spending time in a

---

[1] Plaintiffs have not challenged this ruling.

2

Malaysian refugee camp, in 1979, the family settled near Olympia where Tan became active in the Vietnamese community as the principal of a Vietnamese language school and member of the VCTC.

The VCTC was started in the 1970s and became a nonprofit corporation in 1997. Duc Hua was elected its president in 1995. Tan is its director of education and is recognized as one of the organization's leaders, although apparently his position is not part of the executive committee. The VCTC's purpose is to provide cultural support for Vietnamese refugees in Thurston County.

Norman Le, Dat Ho, Phiet Nguyen, Nhan Tran, and Nga Pham (defendants) were all born in Vietnam. Tan and the VCTC (together generally referred to as plaintiffs) brought this lawsuit against these five defendants as well as their marital communities. Tran and Ho escaped Vietnam when Saigon fell in 1975. Norman Le was imprisoned in a labor camp for nine years and seven months. Phiet Nguyen was imprisoned in a labor camp for six years and six months.

Like Tan, defendants are politically active in the Vietnamese community. Norman Le was the VCTC's secretary for several years. The defendants are all members of the Committee Against the Viet Cong Flag, which was formed in 2003 to seek removal of the Socialist Republic Vietnamese flag from the lobby of South Puget Sound Community College. Many Vietnamese refugees view Vietnam's current flag as the "communist flag," eliciting painful memories and emotions. The local Vietnamese community has divided over strategies for seeking the removal of communist flags in the region.

The e-mail message and newsletter articles at issue relate to the series of incidents described below.

## I. The Incidents

### A. *Name Change of the VCTC*

The VCTC was formed in 1975 as the Vietnamese Mutual Assistance Association. In 1995, the organization voted to change its name. Defendant Le suggested that the new name include the word "national" or "nationalist" to signal a clear anticommunist agenda. Le's proposal was defeated. The organization was renamed the "Vietnamese Community Association of Thurston County," which was eventually shortened to "Vietnamese Community of Thurston County." Le later interpreted the decision to not include "nationalist" in the name to signal the organization's communist sympathies.[2] In the defendants' signed letter (the "Public Notice"), at issue in this case, they noted, "all the local anti-communist organizations, societies, had boycotted and did not recognize it from the beginning," after the name change. Ex. 8.

### B. *VCTC Allegedly Receiving Money from the Viet Cong*

Following the name change, defendant Le raised concerns about a local market owner's monetary contribution to the VCTC. Le was uncomfortable accepting a donation from the market owner because the owner previously distributed free calendars that had been printed by the Communist Party in Ho Chi Minh City. The VCTC called a

---

[2] There is also an organization in Washington called "Vietnamese Community of Pierce County." Le claims he also has concerns about this organization's commitment to the anticommunist cause but says he has not found any proof to confirm his suspicions. However, he also acknowledges that in 2003, there were few communist sympathizers living in the United States.

meeting to ask the owner why he had printed the calendars in Ho Chi Minh City.

Satisfied that the owner had the calendars printed in Vietnam because it was cheaper, the

VCTC accepted his monetary donation. Le testified that at the meeting, Hua, president of

the VCTC, stated, "There is nothing wrong with receiving V.C. [(Viet Cong)] money."

7 Verbatim Report of Proceedings (VRP) at 1398. Hua denies saying this, testifying that

he said only that the VCTC accepts any donation as long as no conditions are attached.[3]

C. *Playing of National Anthem*

On October 4, 1997, the VCTC organized an event to honor a Vietnamese poet.

At the start of the event, one member of the hired band, a recent refugee from Vietnam,

began to play Vietnam's current national anthem. After the first few notes, the band

apologized for playing the wrong anthem and proceeded with the national anthem of the

Republic of South Vietnam. At trial, there was conflicting testimony regarding the

crowd's reaction, with plaintiffs' witnesses claiming the crowd barely noticed and

defendants' witnesses alleging there was a negative reaction. Two local Vietnamese

newsletters published articles about the incident, at least one of which was authored by

Le. Le wrote this article despite not being present to hear the wrong anthem played or to

see the crowd's reaction. The VCTC held a press conference to apologize for the

mistake.

---

[3] Defendants have not accused the market owner of being a Communist or a Communist sympathizer.

## D. Scheduling Events on Communist Holidays

In the fall of 1999, the VCTC newsletter suggested scheduling a cultural event on September 2. The event, Armed Forces Day, commemorates the establishment of the Southern Vietnamese Army and is typically held on June 19. The Vietnamese community knows September 2 as the date of the "Fall Revolution," when the Communist Party declared independence from the French. Additionally, one of the defendants testified that events sponsored by the VCTC sometimes occurred on April 30, the anniversary of the fall of Saigon. At least one defendant testified that these dates were inappropriate for any Vietnamese celebration or event.

## E. Flag Display at Language School

Plaintiff Tan ran a Vietnamese language school for children of Vietnamese refugees. Lacking its own facility, the language school borrowed classrooms from a private school. Before every class, the students gathered in the hallway to salute the flag of the Republic of South Vietnam and sing its national anthem. One of the classrooms displayed flags from around the world, including the current flag of the Socialist Republic of Vietnam. Tan testified that because the classroom was on loan from the private school, the language school's policy was not to touch or modify the display. The defendants accused Tan of not acting vigorously enough to oppose the display of the flag. Facing resistance from the classroom's teacher, the private school principal decided not to display any Vietnamese flag. Although the defendants knew Tan had the students honor the nationalist flag before every class, the defendants sent a delegation to the

school to meet with the teacher and the principal. Eventually, the principal agreed they could display the nationalist flag at the school although his reason for doing so is disputed.

*F. Leadership of the Committee against the Viet Cong Flag*

In early 2003, several concerned community members met to discuss how to stop the community college from displaying the communist flag of Vietnam. The committee elected Le cochair at the first meeting. At the second meeting, because of Le's controversial involvement in other organizations and a dramatic increase in attendance, Tan proposed Le step down so the organization could hold new elections. Tan's proposal failed and Le remained one of the cochairs. Many of those in attendance left the meeting and withdrew their support when reelections were not held. Tan and members of the VCTC continued their efforts to remove the communist flag, but did so separately from the defendants' organization.

*G. The Apron Incident*

Every year, the VCTC sponsors a food booth at the Lakefair celebration in Olympia. In 2003, a volunteer working in the booth found an apron on top of a vending machine outside of the booth. The apron was decorated with an image of Santa Claus and several gold stars. The volunteer, who had served in the Southern Vietnamese Army, believed the apron bore communist symbols and must have been placed there by "some kind of bad people." 2 VRP at 364-65. No one knew where the apron came from, but plaintiff Tan dismissed the idea that it was communist propaganda. The volunteer turned

7

the apron inside-out and wore it that way for the rest of his shift. He took the apron home with him at the end of the day.

Ten days later, the volunteer told Tuan Vu, previously a defendant in this litigation, about the apron. Vu said that he would like to keep the apron as a "souvenir." 2 VRP at 366-67. The apron later came into defendants' possession.

On August 7, 2003, the defendants disseminated the Public Notice, describing the apron incident as an intentional display of communist symbols to show the presence of the communist regime in the Vietnamese community. The letter called for a press conference and meeting to debate the allegations, but neither plaintiff Tan nor any other VCTC representative attended the meeting. Defendants did not approach Tan or any other member of the VCTC to ask for an explanation about the apron or any of the other accusations in the Public Notice. Defendant Le testified that to ask Tan about his background would have been culturally taboo.

At trial, the jury heard from a former colonel in the South Vietnamese army who was imprisoned by the communists for 13 years. Despite great animosity toward the Viet Cong flag, he did not recognize the apron as being a communist symbol.

## II. The Publications

The defendants disseminated the Public Notice by e-mail and posted it on the Internet. According to their own testimony, defendants worked together to carefully select the language in the Public Notice. The first section of the letter describes the apron

incident. The second section, as summarized below by the Court of Appeals, accuses the

VCTC of "doing activities" for the Vietnamese communists:

> 1. When choosing a name (for the organization), the Duc Thuc Tan (Duc TT) and Khoa Van Nguyen gang insisted that the name "National Vietnamese Committee" . . . be denied. . . . Mr. Duc TT claimed . . . he "does not have members". . . . It is obvious that [the] Vietnamese Community in Thurston County had been impersonating the representatives of the community with illegal political intentions.

> 2. Duc Minh Hua, . . . President [of VCTC], . . . declaring . . . "there [was] nothing wrong with receiving [Viet Cong] money."

> 3. Suggest[ing] the idea of organizing the yearly anniversary of September 2 [the Fall Revolution].

> 4. The band that Duc TT brought . . . played the whole portion . . . of the [communist national anthem at the 1997 event].

> 5. [The] [Viet Cong] flag was hung in [Duc Tan's] classroom . . . [u]ntil . . . organizations . . . convince[d] the Administration to remove the [Viet Cong] flag and let fly the National flag.

> 6. Organized the Autumn 2002 Meeting to commemorate the Fall Revolution.

> 7. Had sabotaged the fight of the Committee . . . from the unit in charge of the Community Against Viet Cong Flag [and] had "gone under the table" with the administration of . . . [South Puget Sound Community College] to send the secret message [that] there is no need for removing the bloody communist flag.

> 8. [C]leverly [covering] up, cheating [our] people, all those 28 years [as shown by Duc Tan's admission the VCTC had no voting members].

*Duc Tan v. Le*, 161 Wn. App. 340, 350, 254 P.3d 904 (2011) (alterations in original)

(citing Ex. 8). The third section concludes that plaintiff Tan and members of the VCTC

have abused people's names, hidden under the "Nationalist coat" to serve the communist

regime in Vietnam and betrayed the Vietnamese community "continuously and systematically." *Id.* at 350-51. The Public Notice states that no one—referring to Tan and the leaders of the VCTC—has a background (service in South Vietnam's military or time spent in a labor or reeducation camp) guaranteeing they are Nationalists. *Id.* at 351. Finally, it urges that community members condemn, boycott, and expel Tan and the VCTC, who allegedly "worship the Communists" and conduct activities on behalf of "evil communists." *Id.*

Three additional newsletter articles, written by defendant Le alone, contain allegedly defamatory statements. Two articles were published on November 15, 2002, in the *Community Newsletter*, an informal publication of the Vietnamese community of Washington. The first article describes the flag display issues at the language school. It states that after the delegation came to the school and convinced the principal to allow them to permanently display the Vietnamese Nationalist flag, plaintiff Tan refused to help display it. Exs. 14A, 18. The second article warns of an "Evil Axis" made up of organizations that assist the Viet Cong. Ex. 14A. This article identifies the VCTC as one such organization, noting that it played the Viet Cong national anthem and called for a celebration on September 2. The article claims that the leadership of the VCTC is part of a plot "to form the Evil Axis in Thurston-King-Tacoma aiming at a total control over the whole Vietnamese community in Washington State by the VC." *Id.* Finally, the article notes that the VCTC members never use the word "Nationalist" in any of their

organizations' names. *Id.* (emphasis omitted). These two articles were translated and admitted into evidence at trial.

The third article was published in October 2003, in a newsletter called *New Horizon: The Voice of the Vietnamese Community in Washington State.*[4] This article refers to Tan's organization as a "VC under-cover agent[]." Ex. 14A. It asserts that for many years undercover agents, including Tan, have attempted to display Viet Cong flags in schools while disguised as Nationalists. Excerpts of this article were translated and admitted into evidence. This article was singled out by the Court of Appeals as particularly problematic because Le made the undercover agent allegation about Tan and other VCTC members without disclosing facts in support of his claim.

## III. Procedural History

In March 2004, plaintiffs sued defendants for defamation based upon the allegations in the Public Notice and Le's articles.

The trial court granted partial summary judgment for the defendants, ruling that plaintiff Tan and the VCTC "are public figures as a matter of law." Clerk's Papers (CP) at 31. The trial court made no findings pertaining to the "capacities or status of defendants when publishing the alleged defamatory materials." *Id.* at 32.

After an 11 day trial, the jury found by special verdict that each of the defendants had defamed Tan and the VCTC; the jury awarded Tan damages of $225,000 and the VCTC damages of $85,000. The jury was asked to complete four special verdict forms,

---

[4] The naming structure of this newsletter parallels the name of plaintiff Vietnamese Community of Thurston County. Ironically, defendants suggested this naming structure might signal ties to communism.

11

the first asking whether defendants defamed Tan in the Public Notice, the second asking whether the defendants defamed the VCTC in the Public Notice, the third asking whether Le defamed Tan in his articles, and the fourth asking whether Le defamed the VCTC in his articles. The jury answered yes to all questions. It then awarded $150,000 to Tan and $60,000 to VCTC based upon the defamatory effect of the Public Notice and $75,000 to Tan and $25,000 to VCTC based upon the subsequent three articles.

The Court of Appeals reversed and remanded for dismissal. *Tan*, 161 Wn. App. at 366. The court concluded that the "sting" of most of the statements made by defendants was that Tan and the VCTC are communists and that the right to call someone a communist is protected by the First Amendment. *Id.* at 356-57. It reasoned that "defendants' mischaracterizations, exaggerations, and seemingly improbable inferences took place in an ongoing political discussion protected by the First Amendment." *Id.* at 366. As to any statements not protected by the First Amendment, because the Court of Appeals accepted that the defendants subjectively believed the truth of their allegations, it concluded that plaintiffs failed to prove actual malice. *Id.* at 364.

## ANALYSIS

A defamation action consists of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 768, 776 P.2d 98 (1989). Actual malice must be shown in cases involving both public figures and public officials. *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (plurality opinion). Rhetorical hyperbole and statements

12

that cannot reasonably be interpreted as stating actual facts are protected under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

Historically, defamatory communications were deemed actionable regardless of whether they took the form of opinion or fact. *Id.* at 11. However, due to concerns about stifling valuable public debate, the privilege of "fair comment" was incorporated into the common law as an affirmative defense to an action for defamation; it afforded "'legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.'" *Id.* at 13 (quoting 1 FOWLER V. HARPER & FLEMING JAMES, JR., LAW OF TORTS § 5.28, at 456 (1956)). Generally, the privilege of fair comment applied only to a statement of opinion and not to a false statement of fact, whether it was expressly stated or implied from an expression of opinion. *Id.* at 14 (citing RESTATEMENT (SECOND) OF TORTS § 566 cmt. a (1977)). "Thus under the common law, the privilege of 'fair comment' was the device employed to strike the appropriate balance between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech." *Id.*

Even at common law, the privilege of fair comment did not extend to "'a false statement of fact, whether it was expressly stated or implied from an expression of opinion.'" *Id.* at 19 (quoting RESTATEMENT § 566 cmt. a). In *Milkovich*, the Supreme Court reiterated that a statement structured as an opinion may still be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion,

13

because it may then contain a provably false factual connotation. *Id.* at 20 (citing *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *Dunlap v. Wayne*, 105 Wn.2d 529, 540, 716 P.2d 842 (1986) (quoting RESTATEMENT § 566).

As the Supreme Court explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.

497 U.S. at 18-19.

The defendants here argue their statements about plaintiffs Tan and the VCTC's communist affiliations were protected by the First Amendment because defendants expressed an opinion based upon disclosed facts. To support their argument, they point to *Restatement* § 566 (a defamatory statement may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion).

We reject defendants' argument. The mere fact that the defendants disclosed a basis for their false charge that Tan and the VCTC support the Viet Cong government does not protect them from liability when the opinion itself is based on false and defamatory facts.

> A simple expression of opinion based on disclosed or assumed *nondefamatory* facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed

or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently.

RESTATEMENT § 566 cmt. c (emphasis added), *quoted in Dunlap*, 105 Wn.2d at 540.

When the audience knows the facts underlying an opinion and can judge the truthfulness of the allegedly defamatory statement themselves, the basis for liability for the opinion is undercut. RESTATEMENT § 566 cmt. c. Thus, to determine liability for an opinion statement it is crucial to ascertain the type of information that underpins an opinion:

> "When a publisher makes a qualified or unqualified assertion of fact based on *true* information supplied to the public or equally available to the public, he simply deduces a particular fact about the defamed person from known facts. . . . Those who receive the communication are in a position to judge for themselves the validity of the deduction made. . . . [Such] opinions must be distinguished from evaluative opinions expressing a value judgment concerning specific conduct. The distinction will eliminate much confusion of the law of defamation if the law recognizes that deductive opinions are not necessarily in the same category of actionability as . . . communications that convey false and defamatory information about the plaintiff."

*Dunlap*, 105 Wn.2d at 540 (emphasis added) (alteration in original) (quoting W. Page Keeton, *Defamation & Freedom of the Press*, 54 TEX. L. REV. 1221, 1250-51 (1976)).

This case does not involve a situation where defendants deduced the opinion that Tan and the VCTC are communist or communist sympathizers from nondefamatory disclosed information. *See* RESTATEMENT § 566 cmt. c. Rather, defendants made a series of false statements to support their assertion that plaintiffs supported communism and the Viet Cong government.

Indeed, the vast majority of the statements made by defendants were made as statements of fact, not opinion. For example, statements in the Public Notice accuse Tan

15

and the VCTC of taking certain procommunist actions or otherwise connect plaintiffs to communism: (1) that Tan and the VCTC "impersonat[ed] the representatives of the community" and conducted activities on behalf of "evil communists;" (2) that Tan's hired band played a few notes of the Viet Cong anthem and prompted a violent protest; (3) that Tan displayed the Viet Cong flag at his Vietnamese language school; (4) that VCTC President Duc Hua stated that "there is nothing wrong with receiving VC money;" (5) that a meeting occurred between the VCTC and the community college where the VCTC sent a secret message that there is no need to remove the Viet Cong flag; (6) that plaintiffs displayed the apron to show the presence of the Hanoi Communist regime in the Vietnamese community; (7) that Tan and other VCTC members lack a background as Nationalists (not in the military to protect the South Vietnam nor imprisoned by the Communists); (8) that the VCTC has been accused by several anticommunist organizations of doing activities for the Vietnamese Communists; and (9) that plaintiffs planned community events on dates associated with the Viet Cong for the purpose of celebrating North Vietnam. Ex. 8 (emphasis omitted).

In the articles written by defendant Le, there is substantial repetition of the statements made in the Public Notice. Additionally, in one article, Le refers to Tan's organization as a "VC under-cover agent[]" seeking to display Viet Cong flags. Ex. 14A. While an allegation that someone is a communist may be merely imprecise or loose language, it is "quite another case" to accuse someone of being an agent of the Viet Cong communist government. *See Buckley v. Littell*, 539 F.2d 882, 894 n.11 (2d Cir. 1976).

16

Statements of "membership or well-defined political affiliation are readily perceivable as allegations of fact susceptible to proof or disproof of falsity." *Id.* at 894.

Moreover, defendants' assertions that could be construed as opinion statements imply undisclosed defamatory facts or are otherwise provably false. In the Public Notice, for example, relying on their allegations of the ways in which Tan and the VCTC supported the Viet Cong government, defendants opine that plaintiffs had "illegal political intentions," betrayed the local community, cheated the Vietnamese people for 28 years, and worshipped the Viet Cong government. *See* Ex. 8 (emphasis omitted). These statements imply undisclosed defamatory facts regarding plaintiffs' connection to the unpopular Viet Cong government. These statements carried a provably false factual connotation.

There is no First Amendment protection for the type of false, damaging statements uttered here; indeed, the purpose of the law of defamation is to punish such statements. *Milkovich*, 497 U.S. at 12.

We hold that the Public Notice and articles written by Le each contain actionable statements, not protected by the First Amendment.

Defendants urge us, though, to apply *Mark v. Seattle Times*, 96 Wn.2d 473, 635 P.2d 1081 (1981), and *Herron*, 112 Wn.2d 762, to conclude their statements are nonactionable. We reject this argument as well.

In *Mark* and *Herron* this court held that there is no liability when defendants' true factual statements create the "sting" of the damaging publication and their additional

17

false statements do not cause any separate or additional harm. *Mark*, 96 Wn.2d at 496; *Herron*, 112 Wn.2d at 771-72. In *Mark*, Albert Mark was arrested after being charged with larceny based on fraudulent Medicaid billing. 96 Wn.2d at 496. A news report stated that Mark had "bilked the state out of at least $300,000." *Id*. Ultimately, the State was only able to prove fraudulent claims totaling about $2,500. *Id*. at 477. Concluding the gist of the report was the arrest of Mark for Medicaid fraud involving substantial funds, the court found that any inaccuracy in the specific amount involved did not alter the sting of the publication as a whole and did not have a materially different effect on a viewer than what the literal truth would have produced. *Id*. at 496.

*Herron* involved a newscast, which stated that "'a prosecuting attorney was being investigated in respect to practices concerning bail bonds, that he had a close friend who was arrested with two local bondsmen, and that he had accepted substantial sums from a bondsman to finance election campaigns.'" *Herron*, 112 Wn.2d at 770 (quoting Clerk's Papers). The newscast also stated that half of Herron's election funds came from bail bondsmen, when in fact the true figure was closer to two percent. *Id*.; *see id*. at 766. Because this inaccuracy suggested Herron was involved in bargaining "'away his ethics and integrity in exchange for campaign contributions,'" when in fact he was not, the broadcast caused a sting beyond what the truth would have. *Id*. at 770 (quoting *Heron v. King Broadcasting Co.*, 109 Wn.2d 514, 523, 746 P.2d 295 (1987)).

Relying on these two cases, defendants argue that the sting of the publications is the charge of being a communist or communist sympathizer. Defendants contend that

18

this allegation is an opinion, and opinions are protected under the First Amendment. It follows, defendants argue, that because the allegations they made were merely in furtherance of their protected opinion and caused no further sting, the First Amendment provides protection for the statements they published.

In *Mark* and *Herron* this court considered whether false facts caused harm to reputation in excess of the harm caused by the true facts. Defendants seek an extension of the "sting" analysis to allow opinion statements to provide protection to otherwise actionable false statements.

*Mark* and *Herron* were never meant to apply as argued by defendants. In those cases the court compared the harm caused by an objective truth (*Mark*: the arrest of Mark for Medicaid fraud involving $2,500; *Herron*: a prosecutor's receipt of a small amount of funds from local bondsman) with the harm caused by potentially actionable false facts (*Mark*: that Mark "bilked the state out of at least $300,000;" *Herron*: half of Herron's election funds came from bondman). The court in each case then determined whether the latter caused a separate, additional harm. In both cases the ultimate purpose of the inquiry was to determine whether a false statement actually caused damage in excess of what the truth would have caused.

In this case there is no objectively established truth. Defendants insist that the sting of their allegations is that Tan and the VCTC are communists or communist sympathizers. However, there are no true statements showing Tan and the VCTC are communists or communist sympathizers. It is impossible then to compare the harm to

reputation caused by false statements with the harm to reputation that would have been caused by the truth alone, and the "sting" analysis of *Mark and Herron* does not apply.

Next, we must decide whether the evidence supports the jury's decision that defendants acted with actual malice. A public figure defamation plaintiff must prove with clear and convincing evidence that the defendant made the statements with "actual malice."[5] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510-11, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984). A defendant acts with malice when he knows the statement is false or recklessly disregards its probable falsity. *Id.*

We do not measure reckless conduct by asking whether a reasonably prudent person would have published or would have investigated before publishing. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). Actual malice can, however, be inferred from circumstantial evidence, including a defendant's hostility or spite, knowledge that a source of information about a plaintiff is hostile, and failure to properly investigate an allegation. *Margoles v. Hubbart*, 111 Wn.2d 195, 200, 760 P.2d

---

[5] Amici invite us to replace the preponderance of the evidence standard with the clear and convincing evidence standard for proving falsity in defamation cases. However, the law of this case is that only actual malice must meet the clear and convincing standard. Further, faced with an opportunity to change the standard of proof in *Richmond v. Thompson*, 130 Wn.2d 368, 388, 922 P.2d 1343 (1996), this court held, "Neither the common law nor the First Amendment, as interpreted by the United States Supreme Court, requires proof of any element of a defamation action, other than actual malice, by evidence of convincing clarity." (quoting *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 582, 811 P.2d 231 (1991)).

324 (1988); *Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 172, 736 P.2d 249 (1987). These factors in isolation are generally insufficient to establish actual malice; they must cumulatively amount to clear and convincing evidence of malice to sustain a verdict in favor of a plaintiff. *Id.* However, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. Evidence of intent to avoid the truth may also be sufficient to show actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). Professions of good faith are unpersuasive when a publisher's allegations are so inherently improbable that actual malice may be inferred from the act of putting such extreme statements in circulation. *Margoles*, 111 Wn.2d at 201; *St. Amant*, 390 U.S. at 732.

When reviewing a defamation verdict, the First Amendment requires us to independently evaluate whether the record supports a finding of actual malice. *Richmond v. Thompson*, 130 Wn.2d 368, 388, 922 P.2d 1343 (1996); *Bose Corp.*, 466 U.S. at 510 ("The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law."). Appellate courts must "'make an independent examination of the whole record'" to ensure the judgment does not constitute a forbidden intrusion on the field of free expression. *N.Y. Times Co.*, 376 U.S. at 285 (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963)). We have considerable latitude in deciding whether the evidence supports a finding of actual malice. However, "the constitutionally based rule of independent

review" does not mean that we disregard credibility determinations of the trier of fact. *Bose Corp.*, 466 U.S. at 499-500; *see Harte-Hanks*, 491 U.S. at 689 n.35 (appellate court should not disregard a jury's opportunity to observe live testimony and assess witness credibility). Deference to factual determinations that turn on credibility assessment is essential because of the fact finder's unique opportunity to observe and weigh witness testimony.[6] *Harte-Hanks*, 491 U.S. at 688; *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 670-71 (9th Cir. 1990).[7]

In *Richmond*, two eyewitnesses stated Trooper Richmond did not threaten to blow Thompson's brains out, did not push Thompson, and did not unclip his weapon after Richmond had brought a defamation action against Thompson for allegations to this effect. 130 Wn.2d at 374-75. On review, after the jury found actual malice, this court concluded a reasonable juror could have inferred from the evidence that Thompson knew the falsity of his allegations. *Id.* at 388-89.

*Harte-Hanks* concerned a newspaper company that failed to conduct an interview that would likely have led to information confirming or contradicting the facts of a story it was about to publish. 491 U.S. at 682. The Court inferred intentionality because the newspaper contributed substantial resources to investigating the story, but failed to

---

[6] Recognizing the difficult position in which an appellate court is placed, the Ninth Circuit has noted the reviewing court faces the "daunting task of reconciling our duty to respect the jury's fact-finding role with our duty to protect the values enshrined in the First Amendment" because the independent review standard and the clearly erroneous standard are in tension. *Newton*, 930 F.2d at 666. "[W]e must simultaneously ensure the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact." *Id.* at 670.

[7] The dissent's claim that we grant improper deference to the jury, which evidently flows from its view that appellate review is entirely a matter of this court's independent review of the record, is thus incorrect. *See* dissent at 10.

interview the one witness most likely to have evidence bearing on the truth or falsity of two competing narratives. *Id.* The newspaper also failed to listen to tape recordings with evidence relevant to the story. *Id.* at 683.

After conducting its own independent review of the evidence, the Court of Appeals in this case found the evidence did not establish actual malice because defendants' behavior only rose to the level of negligence, not the required recklessness. *Tan,* 161 Wn. App. at 364.

The Court of Appeals aptly observed that *Harte-Hanks* involved undisputed evidence of an intentional failure to ascertain the truth and *Richmond* included direct evidence from two nonparty eyewitnesses that revealed Thompson could not have had a good faith belief in the truth of his statements. *Id.*; *Harte-Hanks,* 491 U.S. at 692; *Richmond,* 130 Wn.2d at 389. However, the Court of Appeals incorrectly concluded that the lack of this type of evidence here bolstered its own finding that Tan and VCTC failed to show actual malice. *See Tan,* 161 Wn. App. at 365. *Harte-Hanks* and *Richmond* are merely illustrative of the type of evidence that will support a finding of actual malice.

Here, the issue of malice turns largely on the credibility of the witnesses, particularly of defendants. The jury was properly instructed on the requirement of actual malice and the ways in which it could be satisfied. The jury was told it may only find defamation in this case if the actual malice requirement was met. The question that the jury was required to answer was whether defendants were credible when they claimed they acted in good faith when they published the Public Notice and articles about Tan and

23

the VCTC. Having had the opportunity to assess each witness' credibility, the jury was ideally suited to answer this question, and even when conducting an independent review, the appellate court must strongly defer to the jury's determinations of credibility. *See Harte-Hanks*, 491 U.S. at 688-89; *Newton*, 930 F.2d at 670-71.

In *Harte-Hanks*, the Supreme Court suggests that the reviewing court should only defer to the credibility determinations the jury must have made, not the ones it may have made. 491 U.S. at 689-90. In order for the jury to have found for Tan and the VCTC, it must have rejected (1) the testimony of defendants that without entertaining serious doubts they relied in good faith on newsletter articles to support all their claims in the Public Notice (even though the articles submitted into evidence only discussed the anthem incident), (2) that the Public Notice cosigners otherwise made all their allegations in good faith, and (3) that Le wrote the subsequent newsletter articles in good faith. *See id.*

The jury was in the best position to determine which testimony to believe and whether to accept defendants' claims of good faith.

We defer to the jury's determination that defendants were not credible when they claimed to have made their accusations in good faith. This, together with our independent review of the record leads us to conclude there was clear and convincing evidence to support the inference of actual malice.

Specifically, (1) defendants knew that people did not boycott the VCTC because Le himself remained associated with the VCTC for years after the name change; (2) Le

knew that Hua never said he would accept Viet Cong money because Le was present when Hua spoke and the defendants did not accuse the market owner who donated the funds of being pro-Communist; (3) the VCTC newsletter did not advocate for organizing on the anniversary of September 2; (4) the defendants were aware that the playing of the Vietnam national anthem was an accident and that the VCTC issued an apology; (5) none of the defendants testified that Tan actually refused to display the nationalist flag, and Dat Ho even testified that he was aware that Tan displayed the national flag at the language school; and (6) the defendants admitted that if the VCTC had held a meeting to commemorate the Fall Revolution, there would have been an uproar and significant media attention, which no one testified had occurred.

As noted earlier, actual malice can also be inferred from circumstantial evidence, including a defendant's hostility or spite, knowledge that a source of information about a plaintiff is hostile, and failure to properly investigate an allegation. *Margoles*, 111 Wn.2d at 200.

The evidence here is that (1) the committee members made no attempt to contact Tan before publishing the Public Notice; (2) the defendants had previously worked with Tan to organize events opposing communism until the divisive flag committee meetings in 2003; (3) the defendants had a history of acrimony with Tan; (4) some of the defendants had witnessed Tan speak publicly on flag issues, including speaking in support of displaying the nationalist flag; (5) the defendants failed to investigate any of the facts before publication, including the authenticity of the apron; and (6) the

defendants were upset that Tan arranged a meeting with the dean of the community college because it diverted attention from their committee.

As discussed above, *Harte-Hanks* involved a decision to publish a story without interviewing a person or listening to a tape, although each was believed to have relevant information. Similarly, this case involves systematic and continuous failures to interview Tan, Duc Hua, or anyone else with information that would bear on the defendants' allegations. Without providing specifics, defendants only vaguely pointed to articles they read and sources they consulted.[8]

As early as 1997, Le already had a tense relationship with Tan and the VCTC. The record reflects little to no effort by defendants, only vague references to articles not produced at trial, supposedly used to confirm their suspicions. *See Harte-Hanks*, 491 U.S. at 692. Then, rather than temper their allegations to reflect their lack of investigation, defendants trumped up their charges, claiming "Duc Thuc Tan and gang" "worship the Communists," "poison our children's minds," and have "continuously and systematically" betrayed the Vietnamese community by working on behalf of the Viet Cong government. Ex. 8. Le went even further by referring to Tan's organization as an "under-cover agent[]" for the communists. Ex. 14A. Defendants directed their publications to refugee communities still living in fear of communists plots to exert

---

[8] The Court of Appeals suggests that defendants did not fail to investigate their allegations because they called for a public hearing and asked Tan and the VCTC to participate *after* defendants had published their accusations; however, even assuming the hearing was an attempt to investigate and not just to make further accusations, the relevant inquiry is whether defendants investigated *before* publishing their statements. *See Tan*, 161 Wn. App. at 364. They did not.

influence upon them, prepared to resort to violence if necessary to combat a perceived threat.

While there is no single smoking gun proving actual malice in this case, the clear and convincing evidence standard does not require defendants to admit on the record they entertained serious doubts as to the truth of their allegations. *See Margoles*, 111 Wn.2d at 200. Considering the record as a whole, there is clear and convincing evidence here justifying the inference of actual malice, as the jury concluded on proper instruction.[9]

## CONCLUSION

We hold that the provably false statements made in the Public Notice and in Le's articles are actionable. We conclude that clear and convincing evidence in this case supports the jury's finding that defendants acted with actual malice. We reverse the Court of Appeals and reinstate the jury's verdict against defendants.

---

[9] As the dissent points out, many parties to this case have lived through traumatic times. However, as an appellate court, we must apply the proper legal standards of review and not decide issues based on the personal experiences and histories of the parties, except as legally relevant to the issues before us. In our system of justice each litigant is entitled to the protection of the rule of law—our fiercely protected and willingly shared right.

27

No. 86021-1

_Madsen, C.J._

WE CONCUR:

_Chambers, P.T._

_Owens, J._

_Stephens, J._

_González, J._

No. 86021-1

J.M. JOHNSON, J. (dissenting)—On April 30, 1975, respondent Norman Le watched as communist North Vietnamese forces stormed the South Vietnamese capital city. 7 Verbatim Report of Proceedings (VRP) at 1372. He saw a North Vietnamese soldier lower the Republic of Vietnam flag from the top of the Independence Palace and replace it with the flag of North Vietnam. *Id.* at 1372-73. Because of his civil government position in the Republic of Vietnam, Norman Le was arrested as a political prisoner. *Id.* at 1367-68, 1373. Mr. Le was continuously imprisoned in a communist labor camp for nine years and seven months. *Id.* at 1376. In 1990, he escaped Vietnam by boat to try to find freedom. *Id.* at 1386. Approximately one million Vietnamese were not as fortunate.[1]

---

[1] *See* Charles Hirschman, Samuel Preston & Vu Manh Loi, *Vietnamese Casualties During the American War: A New Estimate*, 21 POPULATION & DEV. REV., no. 4, 783, 807 (1995).

1

In his flight for freedom, Mr. Le settled in Washington, where he opened a business in addition to directing a refugee center. *Id.* at 1387. He has been an administrator, consultant, and volunteer for countless charitable organizations since. *Id.* at 1388. After escaping to the United States, he earned both an MBA (master of business administration) and a PhD (doctor of philosophy). *Id.* at 1364. Mr. Le is charitably active, especially in the Vietnamese refugee community.[2]

In contrast, a petitioner's admission found in the majority opinion notes that "[Tan's] release" from a communist labor camp "was contingent upon signing a loyalty pledge to the Communist party. To secure his release, Tan signed the pledge." Majority at 2.

Based on genuine beliefs supported by nondefamatory disclosed facts, Mr. Le and the other respondents believed and alleged that the petitioners in this action retained communist sympathies. The majority today reverses the Court of Appeals and reinstates a jury verdict, which found the respondents liable for defamation and awarded $310,000 in damages. The majority's holding is a miscarriage of justice for Mr. Le and all those who have risked everything to enjoy

---

[2] Contrary to the majority's assertion, the experiences and histories of the parties are undeniably relevant to the legal questions at hand. Here, the petitioners have an exceedingly high burden of proving that the respondents acted with knowledge of or reckless disregard for the statements' falsity. The respondents' experiences with communism are most certainly relevant to this analysis. This issue is discussed further, *infra* pp. 17-18.

the protections of the United States Constitution, its First Amendment, and article I, section 5 of the Washington State Constitution.

The United States Supreme Court has recognized that "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). "The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference." *N.Y. Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208, 128 S. Ct. 791, 169 L. Ed. 2d 665 (2008) (citing *Abrams v. United States*, 250 U.S. 616, 630, 40 S. Ct. 17, 63 L. Ed. 1173 (1919)). Extolling the significance of this marketplace of ideas, Judge Learned Hand wisely noted that the First Amendment "'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). Considering our First Amendment jurisprudence in light of these principles, this court has recognized that "the best remedy for false or unpleasant speech is more speech, not less speech." *Rickert v. Pub. Disclosure Comm'n*, 161 Wn.2d 843,

3

855-56, 168 P.3d 826 (2007). This court has also noted that "[a] basic cost of defamation law is its potential chilling effect on the press." *Dunlap v. Wayne*, 105 Wn.2d 529, 534, 716 P.2d 842 (1986). Because the majority fails to accord full protection to the First Amendment's marketplace of ideas, the cost of chilling speech, and the more protective provisions in article I, section 5 of Washington's Constitution, I respectfully dissent.

The majority does not recognize the First Amendment's inherent protection of conjecture within a political debate. Furthermore, while the majority states the *New York Times* standard for determining whether the evidence supports a finding of actual malice, I disagree with this application of the standard. I would therefore hold that the respondents' allegations that Duc Tan and the Vietnamese Community of Thurston County (VCTC) are communists or communist sympathizers are opinions based on disclosed facts within the context of a political debate and thus nonactionable. I would further hold that the petitioners have failed to show that the respondents acted with actual malice in making the underlying factual allegations. Accordingly, I would affirm the Court of Appeals.

A.    Respondents' Assertions that Petitioners Are Communist Sympathizers

The respondents' assertions that the petitioners are communists or communist sympathizers are, at most, conjecture. "Conjecture, when recognizable as such, alerts the audience that the statement is one of belief, not fact. The

4

audience understands that the speaker is merely putting forward a hypothesis. Although the hypothesis involves a factual question, it is understood as the author's 'best guess.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 28 n.5, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (Brennan, J., dissenting). "[C]onjecture is intrinsic to 'the free flow of ideas and opinions on matters of public interest and concern' that is at 'the heart of the First Amendment.'" *Id.* at 34 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)). Conjecture is a powerful means of "fueling a national discourse . . . and stimulating public pressure for answers from those who know more." *Id.* at 35. The cost of punishing conjecture is wiping out "a genuinely useful mechanism for public debate." *Id.* at 36.

In *Dunlap*, this court explicitly adopted the rule of the *Restatement (Second) of Torts* § 566 (1977), holding that statements of opinion that do not imply the allegation of undisclosed defamatory facts are not actionable in defamation. 105 Wn.2d at 538. Although the United States Supreme Court in *Milkovich*, 497 U.S. at 17, held that there is not a separate First Amendment protection for defamatory opinion statements, *Dunlap* is still good law in the state of Washington. This court has not held to the contrary. Although declining to acknowledge the existence of separate protection for statements of pure opinion, the Court in *Milkovich*

determined that protection of opinion was dictated by existing doctrine. *Id.* at 14-17; *see also id.* at 24 (Brennan, J., dissenting).

This court in *Dunlap* formulated a three part test for determining whether a statement should be characterized as nonactionable. "[A] court should consider at least (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap*, 105 Wn.2d at 539. Here, all three factors weigh in favor of finding that the respondents' conjecture that the petitioners are communists or communist sympathizers is nonactionable opinion.

First, the context of the statements was an ongoing political debate about how to best achieve the goals of the Vietnamese refugee community. Recognizing that speech from both sides may bring the truth to the surface, the public notice called for a press conference and meeting to debate the allegations. The petitioners chose not to attend.

Second, the audience mainly comprised Vietnamese immigrants who would have been familiar with the disagreements between the petitioners and respondents. Some members of the audience would have had firsthand knowledge of the circumstances described in the publications. Furthermore, those audience members who are also Vietnamese immigrants can likely interpret the respondents'

statements within a broader cultural context. Mr. Le expressed this principle in his testimony:

> [A]n American reader of that announcement, they might have a different perspective than a person at advanced age, experience, and hardship with the community - - with the communists. They have a different perspective while reading the article.
>
> We have suffered 50 years of hardship, extortion, propaganda. So it create [sic] in our minds a different perspective of things when you read the article.

8 VRP at 1364. I agree. In light of their cultural background and familiarity with the events described, the audience was uniquely situated to determine the validity of the respondents' claims.

Third, the conjecture that petitioners are communists or communist sympathizers does not imply undisclosed facts. The statements include the respondents' versions of incidents that they believe support their allegations that the petitioners harbor communist sympathies. In this way, the audience was given all the necessary information to determine the validity of the respondents' conjecture.

The significance of undisclosed facts is well illustrated by an example from *Restatement (Second) of Torts* § 566 cmt. c, as explained by Justice Brennan in his *Milkovich* dissent:

> [A] statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that it implies the speaker knew

7

undisclosed facts to justify the statement. In contrast . . . the following statement could not be found to imply any defamatory facts:

> "A writes to B about his neighbor C[,] 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.'"

*Milkovich,* 497 U.S. at 27 n.3. Here, the respondents' statements are analogous to the *Restatement*'s example. The conjecture that the petitioners are communists or communist sympathizers is based on the disclosed facts of the apron incident, the flag issues, the national anthem incident, and other such verifiable events. As in the *Restatement*'s example, the link between the disclosed facts and the respondents' conjecture is tenuous. Nevertheless, because the basis for the conjecture is disclosed, the audience may judge for themselves the validity of the allegations. "[A]s long as it is clear to the reader that he is being offered conjecture and not solid information, the danger to reputation is one we have chosen to tolerate in pursuit of 'individual liberty [and] the common quest for truth and the vitality of society as a whole.'" *Milkovich,* 497 U.S. at 36 (Brennan, J., dissenting) (alteration in original) (internal quotation marks omitted) (quoting *Falwell,* 485 U.S. at 50-51). Based on the factors set out in *Dunlap,* the respondents' conjecture that the petitioners are communists or communist sympathizers is nonactionable.

B.      Underlying Factual Allegations

I agree with the majority that conjecture based on disclosed false and defamatory facts is not protected by the First Amendment. However, the majority errs by conflating its analysis of the actionability of the conjecture with its defamation analysis of the disclosed facts upon which the conjecture relies. Having concluded that the respondents' conjecture is nonactionable because the statements were made within a political debate and do not imply the existence of undisclosed facts, we now consider whether the respondents' underlying factual allegations are defamatory. I conclude that they are not.

The United States Supreme Court in *New York Times* established a federal rule that public officials cannot recover damages for defamation unless it is proved that the statement was made with "actual malice." The Court defined "actual malice" as "knowledge that [the statement] was false or [was made] with reckless disregard of whether it was false or not." 376 U.S. at 280. In establishing this standard, the Court recognized a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. The Court further noted that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to

9

. . . survive.'" *Id.* at 271-72 (alteration in original) (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963)). Three years after *New York Times*, the United States Supreme Court in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (plurality opinion), held that the *New York Times* "actual malice" standard applies to public figures in addition to public officials. For both public figures and public officials, the *New York Times* malice requirement is subject to a clear and convincing standard of proof. *Gertz*, 418 U.S. at 342. The trial judge in this case determined that Tan and the VCTC were public figures as a matter of law at summary judgment, and the petitioners have not challenged this ruling. Because the petitioners are deemed public figures as a matter of law, the *New York Times* "actual malice" standard is proper.

In applying the malice standard, we must make an "'independent examination of the whole record'" in order to ensure that "'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984) (quoting *New York Times*, 376 U.S. at 284-86). While purporting to do an independent examination, the majority grants improper deference to the jury. "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks*

10

*Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). We must undertake an independent examination of the facts, and the burden lies with the petitioners to prove by clear and convincing evidence that the respondents acted with knowledge of the statements' falsity or reckless disregard for the statements' falsity.

In her dissent in *Rickert*, Justice Madsen wisely noted the difficulty of meeting the "actual malice" standard:

> [T]he actual malice standard is an exceedingly high standard to meet. Most political speech does not even approach being subject to regulation under this standard; the standard prohibits only the very worst untruths—those made with knowledge of their falsity or with reckless disregard to truth or falsity. In addition, the burden of proof is also high—proof must be by clear and convincing evidence. The actual malice standard is deliberately difficult to satisfy, precisely because free speech rights are at issue. Therefore, much nuanced speech, and all speech that constitutes opinion rather than fact, will simply fall short of it.

*Rickert*, 161 Wn.2d at 859-60 (Madsen, J., dissenting). The justice correctly states the stringent limitations of the malice standard. Here, in addition to being nonactionable as political conjecture based on disclosed facts, the respondents' allegations that the petitioners are communists is opinion and thus cannot meet the malice standard. Furthermore, the respondents' underlying factual allegations certainly do not rise to the level of being "the very worst untruths." They are the epitome of nuanced speech – written in Vietnamese and translated into English,

with testimony being spoken in Vietnamese and translated into English. Considering these facts in addition to the cultural lenses of both the speaker and most of the audience, the nuance of the respondents' speech weighs against a finding of malice.

Although the majority purports to apply the *New York Times* malice standard, they apply strict liability for these statements. This is antithetical to the protections of the First Amendment and causes harm to our system of self-government by chilling valuable political speech. *See United States v. Alvarez*, ___ U.S. ___, 132 S. Ct. 2537, 2544-45, 183 L. Ed. 2d 574 (2012) (striking down the Stolen Valor Act of 2005, 18 U.S.C. § 704, and refusing to recognize "false speech" as a category appropriate for content-based regulation); *Gertz*, 418 U.S. at 334 ("[A] 'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." (quoting *New York Times*, 376 U.S. at 279)); *New York Times*, 376 U.S. at 279 ("Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism . . . even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They . . . 'steer far wider of the unlawful zone.'" (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958))). This "self-censorship" would most certainly "dampen[] the vigor and limit[] the variety of public debate." *New York Times*, 376 U.S. at 279.

The United States Supreme Court has "recognized the 'inevitability of some error in the situation presented in free debate,' . . . and that 'putting to the pre-existing prejudices of a jury the determination of what is "true" may effectively institute a system of censorship.'" *Butts*, 388 U.S. at 152 (plurality opinion) (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 376, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967) (Harlan, J., dissenting)). For this reason, "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a 'high degree of awareness of . . . probable falsity.'" *Gertz*, 418 U.S. at 332 (alteration in original) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)).

In *New York Times*, the newspaper published an editorial advertisement that expressed opinions, recited grievances, and sought financial support for the civil rights movement. A commissioner of the city of Montgomery, Alabama, brought a libel action against the newspaper's publisher and the individuals who signed the editorial. The trial court awarded $500,000 to the plaintiff, and the Supreme Court of Alabama affirmed. The United States Supreme Court reversed, establishing the malice standard for public officials and holding that the evidence was constitutionally insufficient to support judgment for the plaintiff. The editorial contained certain factual inaccuracies. The Court noted:

It is uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions of events which occurred in Montgomery. Although . . . students staged a demonstration on the State Capital steps, they sang the National Anthem and not "My Country, 'Tis of Thee." Although nine students were expelled by the State Board of Education, this was not for leading the demonstration at the Capitol, but for demanding service at a lunch counter in the Montgomery County Courthouse on another day. Not the entire student body, but most of it, had protested the expulsion, not by refusing to register, but by boycotting classes on a single day; virtually all the students did register for the ensuing semester. The campus dining hall was not padlocked on any occasion, and the only students who may have been barred from eating there were the few who had neither signed a preregistration application nor requested temporary meal tickets. Although the police were deployed near the campus in large numbers on three occasions, they did not at any time "ring" the campus, and they were not called to the campus in connection with the demonstration on the State Capitol steps, as the third paragraph implied. Dr. King had not been arrested seven times, but only four; and although he claimed to have been assaulted some years earlier in connection with his arrest for loitering outside a courtroom, one of the officers who made the arrest denied that there was such an assault.

*New York Times*, 376 U.S. at 258-59. Although the United States Supreme Court acknowledged these factual inaccuracies, it still found in favor of the defendants due to a lack of malice on the plaintiffs' behalf. As in *New York Times*, the facts at issue here are disputed and, at times, inaccurate. Exactly what happened with the apron, the national anthem, the flag in the classroom, and the conversation with the shop owner is unclear. However, *New York Times* instructs us that even factual inaccuracies concerning a public figure are constitutionally insufficient to support a defamation judgment.

14

The majority's recitation of the claimed "clear and convincing" evidence of malice in this case is unpersuasive. First, the majority claims that "defendants knew that people did not boycott the VCTC because Le himself remained associated with the VCTC for years after the name change." Majority at 24. This statement contains a logical fallacy. Knowing that others boycotted an organization and remaining associated with the organization oneself are not mutually exclusive.

Second, the majority asserts that "Le knew that Hua never said he would accept Viet Cong money because Le was present when Hua spoke and the defendants did not accuse the market owner who donated the funds of being pro-Communist." Majority at 24-25. A review of the record reveals that there is much disagreement about what was said at that meeting, heightened by the issue of translation of testimony from Vietnamese to English. *See* 7 VRP at 1398. I am not convinced that Hua did not say he would accept Viet Cong money. *See Harte-Hanks*, 491 U.S. at 688-89 ("Although credibility determinations are reviewed under the clearly-erroneous standard . . . the reviewing court must 'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.'" (alterations in original) (quoting *New York Times*, 376 U.S. at 285)).

15

Third, the majority claims that "the defendants were aware that the playing of the Vietnam national anthem was an accident." Majority at 25. This is incorrect at best, unlikely at least. At trial, when asked if he thought the playing of the wrong national anthem was a mistake, Mr. Le testified that "[a] political issue is not that simple, especially when you have experience of how the communists do business." 8 VRP at 1347. He also testified that "[t]o me, with my experience, it's a big deal, because I know [the communists] operate by increments." 7 VRP at 1400. Although the majority claims "the defendants were aware" that the anthem incident was an accident, Mr. Le's testimony indicates that he genuinely believed the playing of the anthem was no mistake but was orchestrated by communist sympathizers.

Fourth, the majority cites as evidence of malice that "the committee members made no attempt to contact Tan before publishing the Public Notice" and "the defendants failed to investigate any of the facts before publication, including the authenticity of the apron." Majority at 25-26. Our case law is clear. "Failure to investigate does not in itself establish bad faith." *St. Amant*, 390 U.S. at 733. The evidence of malice cited by the majority is tenuous at best. The petitioners fail to meet the high bar of proving malice by clear and convincing evidence.

The majority cites to *Margoles v. Hubbart*, 111 Wn.2d 195, 201, 760 P.2d 324 (1988), for the proposition that professions of good faith are unpersuasive

16

when a publisher's allegations are so inherently improbable that actual malice may be inferred. Majority at 21. This may be true, but the majority again conflates the analysis of the opinion statements' actionability with the defamation analysis of the disclosed underlying facts. Here, the "extreme statements" alluded to by the majority are the respondents' allegations that the petitioners are communists or communist sympathizers. These statements are opinions, not facts that should be analyzed under the *New York Times* malice standard. Rather, after deciding the actionability of the opinion statements, courts should turn to a defamation analysis of the underlying disclosed facts. Here, the underlying disclosed facts are not extreme.

Each event described by the respondents actually happened. The description was the respondents' interpretation of events, colored by their cultural and political experience. Because the disclosed facts were not extreme or improbable, the respondents' professions of good faith should weigh against a finding of malice. The respondents' invitation for the petitioners to participate in a public debate also weighs in favor of this finding.

Finally, the malice standard requires consideration of the speakers' mens rea. The majority suggests that "the personal experiences and histories of the parties" are not "legally relevant to the issues before us." Majority at 27 n.9. This assertion is patently incorrect and reveals the majority's misunderstanding of the

17

malice standard. Here, the respondents' experiences and history weigh against a finding that they had knowledge that the statements were false or acted with reckless disregard of the statements' falsity. *See New York Times*, 376 U.S. at 280. Individuals with their experiences and history would be more sensitive to interpreting events as motivated by communist sympathies. Because the malice standard requires a consideration of the speaker's mens rea, it is improper (and at times culturally insensitive) to disregard a speaker's history and experiences.

It is inappropriate to apply either strict liability for a statement's falsity or even a reasonable person standard. Instead, courts must interpret the evidence to determine the speaker's mental state with respect to his statements. The burden is on the petitioners to prove malice by clear and convincing evidence. A lack of evidence means a defamation action cannot stand. Mr. Le testified about his emotional and psychological connections with communism:

> So if you know anything about communism at all, those regime's doctrines, they left a very deep scar, and so a lot of horror [*sic*] impression in my mind. So when I see any display of their symbol, it give [*sic*] me a big scare. For example, 70 percent of the nights when I sleep here, I still dream about my days in their prison.

7 VRP at 1378. Mr. Le and the other respondents have been greatly impacted by communism. Mr. Le spent nearly 10 years of his life in a communist labor camp and has worked tirelessly since his escape to rehabilitate other Vietnamese refugees who have been harmed by Vietnam's current government. Mr. Le and the

18

other respondents are more inclined than most to be mindful of potential communist infiltration of their community.

The majority admits that "there is no single smoking gun proving actual malice in this case" but still finds that "there is clear and convincing evidence here justifying the inference of actual malice." Majority at 27. I disagree. Constitutional free speech rights are not destroyed by such inferences. As did the Court of Appeals, I find that the petitioners have failed to meet the high bar of proving by clear and convincing evidence that respondents acted with knowledge of or reckless disregard for the statements' falsity. The evidence is constitutionally insufficient to support a defamation judgment.

The respondents' allegations that Tan and the VCTC are communists or communist sympathizers are opinions based on disclosed facts within the context of a political debate and thus nonactionable. The First Amendment to the United States Constitution and article I, section 5 of the Washington State Constitution protect such political speech. That an immigrant may be financially destroyed by a $310,000 verdict for engaging in constitutionally protected rights is unacceptable, and violative of precedent in this court and the United States Supreme Court. I respectfully dissent.