IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TED STILES, a married man, | ) | No. 31306-9-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVE MOLNAA, a married man; | ) | UNPUBLISHED OPINION |
| HANFORD ATOMIC METAL TRADES | ) | |
| COUNCIL, a labor organization; | ) | |
| ROBERT HAWKS, a married man; and | ) | |
| TEAMSTERS LOCAL UNION NO. 839 | ) | |
| BUILDING ASSOCIATION, a labor | ) | |
| organization, | ) | |
| | ) | |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — Theodore Stiles sought a position with Washington

River Protection Solutions (WRPS). WRPS contacted one of Mr. Stiles's former

employers, Robert Hawks of Teamsters Local 839, and Dave Molnaa, who is president of

the union's umbrella organization. Both gentlemen provided unfavorable reviews, which

caused WRPS to rescind its tentative offer of employment. Mr. Stiles thereafter sued Mr.

Molnaa, Mr. Hawks, and their employing organizations for defamation and tortious

interference with a business relationship. The defendants moved for summary judgment

on both causes of action, and the trial court granted the motion. Mr. Stiles raises only the defamation claim on appeal. The defendants assert three bases for affirming the trial court: (1) that the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, preempts plaintiff's cause of action; (2) that a blanket release exonerates them from liability; and (3) that RCW 4.24.730, which provides qualified immunity to a former employer responding to a job reference, insulates them from liability. We affirm only upon the NLRA preemption argument, and do not reach the other two arguments.

## FACTS

The people and employers at issue in this case are primarily Hanford contractors or unions representing employees of those Hanford contractors. Mr. Stiles started at Hanford as a truck driver for Battelle where he was also his union's shop steward. From there, he moved onto an internal union position with Teamsters Local Union No. 839 Building Association. He worked for Local 839 from 1998 to 2002, representing union workers in contract negotiations and in grievance hearings.

In 2002, Mr. Stiles left Local 839 to take a position on the opposite side of the bargaining table, representing Sysco in their labor dealings. After a few years, Mr. Stiles moved on to employer-side labor relations at Conoco Phillips.

Then in 2011, Mr. Stiles learned of an opening at WRPS for an industrial relations manager who would represent WRPS in union contract negotiations and grievance adjudications. Mr. Stiles applied for the position. After interviewing Mr. Stiles, WRPS sent Mr. Stiles a letter confirming a contingent offer of employment, including a $140,000 annual salary, bonus, and benefits.

Mr. Stiles also agreed in his employment application to permit WRPS to conduct a background investigation and to hold harmless anyone who provided information during this investigation:

> I hereby voluntarily give the company the right to conduct a background investigation and agree to cooperate in such investigation, and release from all liability or responsibility all persons, companies or organizations supplying such information.

Clerk's Papers (CP) at 133. In the course of its investigation into Mr. Stiles's background, Dominic Sansotta of WRPS spoke with Robert Hawks and Dave Molnaa. This was a logical decision considering Mr. Stiles's history with these two men, but also because Mr. Stiles would have to sit on the opposite side of the bargaining table from these two men if hired.

Mr. Hawks is the secretary-treasurer of Local 839, and was also Mr. Stiles's boss throughout his four years at Local 839. During his deposition, Mr. Hawks testified that he told Mr. Sansotta that he was "going to have a real trust issue with Ted if he's

3

employed at WRPS." CP at 80. Mr. Sansotta inquired further, but Mr. Hawks refused to elaborate, telling Mr. Sansotta that it was confidential and that he did not feel comfortable getting into specifics.

In his deposition, Mr. Hawks elaborated on the specifics that he refused to disclose to Mr. Sansotta. Mr. Hawks explained that Mr. Stiles was a womanizer, had an incident just after being hired in 1998 where he got drunk at a semi-annual union dinner and hit on Mr. Hawks's sister, and also used to tell stories about how he would cheat on his wife whenever he was out of town on union business. Mr. Hawks also relayed an incident where Mr. Stiles racked up a large bill at a Kinko's doing copies for an out-of-state grievance hearing with UPS when he should have done those copies at the union office prior to leaving. Mr. Hawks, however, could not remember the date of this incident. He also testified that Mr. Stiles sought to have Mr. Hawks's executive assistant fired when she confronted him about the Kinko's charges. Mr. Hawks next testified that he disciplined Mr. Stiles a couple times for doing outside work on union time. Mr. Hawks again could not remember the dates of any of these incidents, but noted that Mr. Stiles took the discipline/criticism appropriately. Finally, Mr. Hawks testified to an event after Mr. Stiles left Local 839, when he sought a favor from Mr. Stiles to get Local 839 to negotiate with Sysco, but Mr. Stiles refused to help. Testifying in summation, Mr. Hawks

4

said that his opinion was based on the fact that he could not trust a person who cheats on his wife and does not use union money efficiently.

Mr. Sansotta then spoke to Mr. Molnaa. Mr. Molnaa was primarily a truck driver at Hanford and has known Mr. Stiles since the latter was a truck driver for Battelle. Mr. Molnaa is currently the president of the Hanford Atomic Metal Trades Council (HAMTC). HAMTC is an umbrella organization of 14 unions, including Local 839, and represents over 3,000 Hanford employees who are spread across 9 separate employers. Because of this union work, Mr. Molnaa has also known his codefendant, Mr. Hawks, for over 20 years, and has worked closely with him on the HAMTC executive board.

Mr. Molnaa told Mr. Sansotta that he would rather not deal with Mr. Stiles and would prefer someone else from WRPS to meet with him if Mr. Stiles was hired. Mr. Sansotta inquired further and Mr. Molnaa told him, "I couldn't trust him, based on those events that happened in the past." CP at 103. Mr. Sansotta inquired further, and Mr. Molnaa relayed two incidents from his past with Mr. Stiles.

The first incident occurred at a semi-annual union meeting where Mr. Stiles told Mr. Molnaa that he wanted to move up in the union organization and "didn't care who he had to step on to get there." CP at 93. The second incident occurred at another semi-annual union dinner where Mr. Molnaa said that Mr. Stiles got drunk and started hitting

5

on and kissing other women in front of his wife, who then left the dinner in an angry hurry.

Mr. Molnaa also testified regarding two other incidents that caused him to not trust Mr. Stiles, but about which he did not tell Mr. Sansotta. The first happened at another semi-annual union meeting/golf tournament where Mr. Molnaa felt belittled when Mr. Stiles introduced him to John Rabine, a high level union executive, as "just a steward at Hanford." CP at 98. The second incident happened at yet another semi-annual meeting/dinner where Mr. Stiles invited nonunion people to a gathering intended only for union people and encouraged them to order expensive items. Mr. Molnaa testified however that the union's executive board did not discipline Mr. Stiles for the expenses and affirmatively ratified the expenses at a later meeting. Mr. Molnaa also testified that he could not remember when any of these incidents occurred.

After hearing from Mr. Hawks and Mr. Molnaa, WRPS formally rescinded its contingent offer of employment.

Mr. Stiles denied each and every one of these incidents in his deposition. He admitted that he had some friction with Mr. Hawks's assistant, but denied ever seeking her termination. He denied that he ever had excessive charges at Kinko's and denied anyone ever confronting him about such charges. He admitted that he had a trophy

6

business for a while, but denied ever working on that on union time. He also denied being part of a T-shirt business or writing a novel, which also included denials of working on both during union time. He further denied ever being disciplined or talked to for working on nonunion activities during union time.

He testified that he almost never saw Mr. Molnaa, even at the semi-annual functions, because they socialized with different crowds. He testified that the "stepping on" conversation never occurred. He testified that no one ever mentioned him charging excessive meals to the union. He denied being a womanizer. Finally, he testified that he left Local 839 on good terms and never had any strife with Mr. Hawks or Mr. Molnaa.

In a later declaration, Mr. Stiles made a blanket denial of all allegations made by Mr. Hawks and Mr. Molnaa. He stated that his Kinko's charges were always expressly approved by Mr. Hawks and that when he worked for the union they did not prepare their copies in-house because they did not have the facilities to do that. He again denied working on nonunion activities on union time. He denied cheating on his wife, denied picking up women while away on business, and denied bragging about such things. He denied hitting on Mr. Hawks's sister and denied hitting on other women at union functions in front of his wife. He denied belittling Mr. Molnaa to Mr. Rabine, and denied having ever met or known Mr. Rabine. Finally, he denied running up excessive bills at

7

union dinners and denied being disciplined for such things.

PROCEDURAL HISTORY

On May 25, 2011, Mr. Stiles brought a complaint against Mr. Molnaa, Mr. Hawks, and their respective organizations. The complaint alleged defamation and tortious interference with a business relationship against both defendants, and alleged vicarious liability against their employing organizations. Mr. Stiles alleged both economic and noneconomic damages.

The defendants brought a motion for summary judgment on October 12, 2012. The defendants sought summary judgment on several grounds. First, they argued that Mr. Stiles's claims were preempted by the NLRA because Mr. Stiles could not meet the elements of intentional defamation (defamation + actual malice), an exception to preemption. Next, the defendants argued that the blanket release that Mr. Stiles signed applies to his intentional tort claims. The defendants also argued for immunity under RCW 4.24.730—a statute enacted in 2005, which protects current and former employers who provide job-related references.

Mr. Stiles responded to each of the arguments raised in the defendants' motion. The defendants then filed a reply. Mr. Stiles then filed a motion to strike portions of the reply, and argued that those portions raised new arguments. The defendants offered to

8

continue the summary judgment motion to allow Mr. Stiles time to respond. He refused the offer.

On November 16, 2012, the superior court heard argument on the summary judgment motion. The court orally denied Mr. Stiles's motion to strike. The court then signed the order granting the defendants' motion for summary judgment on each of the grounds they argued. Mr. Stiles thereafter appealed to this court.

ANALYSIS

I. *Plaintiff's Motion to Strike*

New issues in support of summary judgment cannot be raised in reply materials unless accompanied by a motion and memorandum in support of the motion. *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 147, 969 P.2d 458 (1999). An aggrieved party may move to strike the offending pleading or offending portions thereof. A court's decision on a motion to strike is reviewed for an abuse of discretion. *King County Fire Prot. Dist. No. 16 v. Hous. Auth.*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994).

Here, Mr. Stiles objected to the reply discussion of "actual malice" and "proof of damages." However, these issues were fairly raised in the defendants' opening memorandum in support of summary judgment in its discussion of NLRA preemption.

The defendants laid out the heightened elements that needed to be met to avoid NLRA preemption, the case law requiring those elements, and alleged that Mr. Stiles could not meet those elements. Moreover, the defendants offered to continue the summary judgment hearing to allow Mr. Stiles greater time to respond, and Mr. Stiles refused the offer. Accordingly, the trial court did not abuse its discretion by denying the motion to strike.

II. *Summary Judgment Standards*

"When reviewing an order for summary judgment, the appellate court engages in the same inquiry as the trial court." *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). "This court will affirm summary judgment if no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* "All facts and reasonable inferences are considered in the light most favorable to the nonmoving party, and all questions of law are reviewed de novo." *Id.* (citations omitted).

III. *NLRA Preemption*

"This court reviews questions of law, including preemption, de novo." *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 100, 233 P.3d 861 (2010). Preemption is an issue in this case because the defendants are two labor organizations and their agents.

10

Section 8(b)(1)(B) of the NLRA prohibits labor organizations and their agents from coercing "an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). Because Mr. Stiles sought to become the employer's labor representative and because the union interfered in this process § 8(b)(1)(B) applies. This court must therefore decide whether Mr. Stiles's lawsuit is preempted by the NLRA.

In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 237, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), a retail lumber business sued a union that was using coercive tactics intended to force the employer to unionize its employees for an injunction and damages. The United States Supreme Court held that the injunction order was preempted by the NLRA, despite the NLRA's refusal to exercise jurisdiction, but remanded to the state court for determination of whether it had different grounds for sustaining its damages award. *Id.* at 238-39. When the state court affirmed the damages, the Supreme Court again accepted review to determine whether the damages award was also preempted. *Id.* at 239. The Supreme Court found that the damages claim was also preempted by the NLRA because the subject actions of the lawsuit arguably overlapped with § 8 of the NLRA. *Id.* at 244-45.

11

Next, we examine whether any recognized exception to the *Garmon* preemption applies to this situation. As identified by the parties, the only applicable exception is the one described in *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966). In *Linn*, an employer's official sued the union for defamatory remarks made by the union in the course of its organizing campaign. *Id.* at 55. Noting that the NLRA is powerless to redress damages suffered by individuals through the use of unfair labor practices, the Supreme Court found that the NLRA should not be read to preempt all state tort actions. *Id.* at 63-64. The Supreme Court also recognized that such lawsuits carry the potential to chill the free debate envisioned by the NLRA and thus frustrate the federal policy. *Id.* at 64-65. The Supreme Court thus struck a middle ground, holding that defamation suits are preempted except in cases of defamation with actual damages and actual malice as defined by *Sullivan*.[1] *Id.* at 65. Therefore, Mr. Stiles's defamation claim is not preempted by the NLRA if he can satisfy the requirements of actual malice *and* damages.

---

[1] *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686

A. Actual Malice

Since *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), the United States Supreme Court has admonished courts not to take the phrase "actual malice" literally because the First Amendment does not require any actual ill will. In *Masson*, the Court explained:

> Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity.

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-11, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (citations omitted).

Here, Mr. Stiles argues that the defendants acted with actual malice because they knew that the events they had used to form their opinions did not in fact occur. Mr. Stiles does not argue that the defendants trust him; rather, he argues that the defendants lied about not trusting him. But whether the defendants do or do not trust Mr. Stiles is irrelevant; rather, what is relevant is whether the defendants have true facts that support

(1964).

their opinions. *Duc Tan v. Le*, 177 Wn.2d 649, 663, 300 P.3d 356 (2013). In *Duc Tan*, there is no question that Le actually believed that Duc Tan was a communist spy who could not be trusted. However, Le was held liable because the facts to support that opinion were—as determined by the trier of fact—false.

Mr. Stiles does not provide declarations, other than his own, to refute his alleged misconduct. Nevertheless, at summary judgment, the plaintiff's evidence is treated as true, and he is entitled to all reasonable inferences. If the underlying reasons why Mr. Hawks and Mr. Molnaa do not trust Mr. Stiles are false, a rational finder of fact could conclude that Mr. Hawks and Mr. Molnaa knowingly lied, and therefore had actual malice. *See id.* at 671 (The jury is entitled to determine actual malice, even when the truth or falsity of the allegations are largely dependent upon the testimony of the parties themselves.). While corroborating nonparty eyewitnesses are desirable, their absence does not mandate summary judgment for the defendants.

B. Damages

Normally, proof of damages would flow from Mr. Stiles's ability to demonstrate actual malice. In defamation cases, damages may be presumed if the trier of fact finds actual malice. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (explaining that presumed damages are constitutionally permissible only

14

in cases where actual malice is proved) (citing *Gertz*, 418 U.S. at 350). Defamation, like trespass, is one of the few areas of tort law where the plaintiff does not need to prove any damages.

However, the Supreme Court made an exception to this rule in *Linn*. When the defamation stems from a labor dispute that would otherwise be preempted by the NLRA under *Garmon*, the claimant must prove actual damages. *Linn*, 383 U.S. at 65. Actual damages does not necessarily mean economic damages. The actual damages may be in the form of "general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law." *Id.*; *see also Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25*, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977) (holding that *Garmon* does not preempt claims of intentional infliction of emotional distress).

Here, Mr. Stiles has failed to make any argument to this court or below with respect to proof of damages. His argument with respect to damages hinges solely on his unsuccessful motion to strike the defendants' discussion of damages at summary judgment. Mr. Stiles has not carried his burden of production with regard to stating a prima facie case on the element of damages.

Nevertheless, we will review the record on this issue. Mr. Stiles's base salary for his new/current job is lower than the salary he would have received at WRPS. Adding his bonuses, however, put him over the salary that he would have received at WRPS. There is no evidence whatsoever what his bonuses would have been at WRPS. Mr. Stiles's failure to argue the point leads to the conclusion that he has failed to meet his burden of production.

Concerning noneconomic damages, Mr. Stiles's deposition and affidavit testimony merely reiterate the claims made in his complaint—that he has suffered mental anguish, emotional distress, humiliation, embarrassment, and loss of reputation. Absent any additional facts, it is not sufficient at the summary judgment stage to simply reiterate the allegations in the complaint. *See Atherton Condo. Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 535-36, 799 P.2d 250 (1990). To the contrary, Mr. Stiles admitted in his deposition that he has not been distressed enough that he has sought help from a mental health professional. Notably, Mr. Stiles stated that his new/current position is his dream job. Regardless, Mr. Stiles's failure to argue the point causes us to reach the conclusion that Mr. Stiles cannot meet his burden of production on this prima facie element. Mr. Stiles's defamation claim therefore is preempted under *Linn*, for lack of argument and evidence to support a prima facie element, actual damages. We therefore

16

No. 31306-9-III
*Stiles v. Molnaa*

affirm the lower court summary judgment dismissal, and do not reach the remaining

issues.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

17